# NEW YORK, NEW HAVEN AND HARTFORD RAIL-ROAD COMPANY v. INTERSTATE COMMERCE COMMISSION.

# INTERSTATE COMMERCE COMMISSION v. CHESA-PEAKE AND OHIO RAILWAY COMPANY.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF VIRGINIA.

Nos. 24, 27. Argued October 25, 26, 1905.—Decided February 19, 1906.

A carrier, not expressly authorized so to do by charter obtained prior to the Interstate Commerce Act, cannot contract to sell, and to transport in completion of the contract the commodity sold, when the stipulated price does not pay the cost of purchase, the cost of delivery, and the published freight rates.

The Interstate Commerce Act was enacted to secure equality of rates and to destroy favoritism, and for those purposes is a remedial statute, to be interpreted so as to reasonably accomplish them; its prohibitions against directly or indirectly charging less than published rates are all embracing and applicable to every method by which the forbidden results could be brought about.

Where a contract of a carrier for sale and transportation is illegal under the Interstate Commerce Act because the amount charged for transportation is less than the published rates, the contract is not made legal because the carrier is also released by the same shipper from a claim, admitted by the carrier and amounting to more than the difference between the published rate and the amount charged, for breach of a prior contract, where it appears that such prior contract was also illegal for the same reason.

Whatever powers a carrier may possess as to its commerce not interstate, it is subject as to its interstate commerce to the Interstate Commerce Act, the application of whose prohibitions depends not upon whether the carrier intends to violate them but upon whether it actually does so.

Congress has undoubted power to subject to regulations adopted by it every carrier engaged in interstate commerce, and although the Interstate Commerce Act may not contain an express prohibition against a carrier becoming a dealer in commodities transported by it the court will enforce the general provisions of the act although in so doing it may render it impossible for a carrier to deal in such commodities.

While the construction of a statute by a body charged with its enforcement which has long obtained, and which has been impliedly sanctioned by the reënactment of the statute without alteration, must be treated, when not

plainly erroneous, as read into the statute, the binding force of such construction on the court is restricted to the precise conditions passed on; and a ruling by the Interstate Commerce Commission as to the right of a carrier, possessing charter rights granted prior to the passage of the act, to also be a vendor is not applicable to the case of a carrier which does not possess such rights.

Where a carrier has violated the provisions of the Interstate Commerce Act in a particular manner in regard to a particular commodity the court may perpetually enjoin it from further violations of that act by the means employed and as to that commodity, but should not enjoin the carrier in general terms not to violate the act in any particular.

THE facts are stated in the opinion of the court.

*Mr. John W. Daniel,* with whom *Mr. Fred Harper* was on the brief, for New York, New Haven and Hartford Railroad Company, appellant in No. 24 and appellee in No. 27:

The petition charges the defendants with violating the Interstate Commerce Act by carrying out the verbal agreement of 1903, involving a carriage of coal for less than the published rates on file and a discrimination forbidden by law.

That contract is justified on two grounds: It does not involve a violation of the act, and if there is a seeming violation of the act, it is only a seeming one. It is based upon a legal, adjusted and enforceable claim for damages asserted by the New Haven Company against the Chesapeake and Ohio; and the freight rate is fully paid by the claim in part and by the purchase price received for the coal added thereto.

Thus the contract of 1896 is the real transaction to which this cause must have reference and under which it must stand or fall. If that contract be valid and legal, so were also the claim for damages and the 1903 contract. If the 1896 contract be illegal, then no breach thereof could furnish a basis for any new contract and the new contract must stand alone.

The contract of 1896 was simply a sale of coal by the Chesapeake and Ohio to the New Haven Company for a sum certain per ton delivered. The Chesapeake and Ohio was likewise the shipper of the coal sold. It is true that various coal operators furnished the coal under contract with the Chesapeake and Ohio,

and various companies and individuals superintended the shipments. But in each instance they acted for the Chesapeake and Ohio and the latter was always the shipper of the coal over its own lines and the water route.

The question of *ultra vires* is not involved. The Chesapeake and Ohio being the seller of the coal to be furnished under the contract of 1896 the Interstate Commerce Commission cannot question the contract as a sale of coal merely, because it has no interest in the mere vending of the coal that would give it a status in any court. Whether or not the Chesapeake and Ohio had the legal right to buy and sell coal is a question with which the court below—and this court as well—has nothing to do so far as this case is concerned.

The *ultra vires* acts of a corporation can only be attacked by the sovereignty granting the charter or by some stockholder or other person interested in the corporation. They cannot be assailed by third parties. Green's Brice's *Ultra Vires*, 2d ed., 695; 4 Thomp. Corp. 5638; 5 Thomp. Corp. 6030 *et seq.*

The West Virginia statutes prohibiting railroad companies from buying and selling coal and coke, have no application to this contract. The reasoning of the court below in disposing of this question is unassailable.

If the contract in question be held to be illegal and void on any ground at all, it must be so held because of the terms of the Federal statutes regulating interstate commerce. Only §§ 2 and 6 were alleged in the court below to have been violated and it is admitted that if the contract of December 3, 1896, were made for the purpose and with the intention of giving to the New Haven Company a "special rate, rebate or drawback" with reference to the transportation of the coal to be delivered thereunder, then the contract would have been a device; and it would have been in violation of § 2; but there can be no question that the contract was one for the sale and transportation of coal made in the utmost good faith and without any intent to give such "special rate, rebate or drawback."

The Chesapeake and Ohio entered the field as a dealer and

made this contract in order to save itself as a carrier and if the contract be held illegal under § 2 (or any other provision of law), it must be so held because of its necessary legal effect apart from the intent with which it was made.

Section 2 of the Interstate Commerce Act prohibits any "special rate, rebate or drawback" whether given "directly or indirectly." There is absolutely no evidence in the record of such direct special rate, rebate or drawback. The absence of the intent to violate the law, as found by the court below, would dispose of that feature of the case. The only remaining question, therefore, under this section is: Was there any "special rate, rebate or drawback" on the transportation of the coal in question over the line of the Chesapeake and Ohio given indirectly?

The reasoning of the court below, in its opinion on this point, seems to us to be unanswerable. The Chesapeake and Ohio was the vendor of the coal. It was also the carrier thereof. It charged the New Haven Company a fixed sum per ton for both the coal and its transportation. It had a perfect legal right to charge any losses that may have occurred to its account as vendor rather than to its account as carrier. Indeed, the provisions of the law required that its full freight rate shall be charged and collected and the company could not legally charge any losses to its account as carrier, just as it could not charge any profits from the contract to its freight rate account. So long as there was a sufficient sum paid to it under the contract to pay its transportation charges, and this was always the case in the matter now under investigation, then the law makes the application to those charges.

So long as the vendor-carrier realized a sufficient sum from the sale of the coal to cover its transportation charges, bearing in mind that the contract of sale is not a mere device to evade the law, there can be no unjust discrimination in the freight rates. *Haddock* v. *Del., Lack. & West. R. R. Co.*, 4 I. C. C. Rep. 296; *Coxe* v. *Lehigh Valley R. R. Co.*, 4 I. C. C. Rep. 535.

The Chesapeake and Ohio, so far as the parties to this case

are concerned, having a perfect legal right to buy and sell and ship coal, to purchase at such price as it might be willing to pay, and to sell at such price as it might be willing to accept and able to obtain, it is impracticable to cause the discontinuance of such buying and selling.

As was intimated in *Coxe* v. *Lehigh Valley Railroad Company, supra,* the fact that a vendor-carrier was willing to sell coal and transport it for such sum as was insufficient to pay all expenses, cost of coal, and transportation charges, would be evidence that its rates were too high and that it was willing to carry such freight at a cheaper rate. So here, if the facts proved show that the Chesapeake and Ohio is willing to contract for the sale and transportation of coal at a less sum than will pay all costs, expenses and its full published freight rates, it is evidence that such rates are too high and that the Chesapeake and Ohio is willing to transport such coal at a cheaper rate.

But there is no allegation in the petition that the rates are excessive or unreasonable. There is no prayer that the court will so hold. And so long as there is a sufficient sum realized from a sale honestly made by a vendor-carrier to pay its full transportation charges, there can be no discrimination with respect to those charges, and there is no violation of § 2 of the act.

If the conclusion reached with reference to section 2 of the act is correct, then no discussion of section 6 is necessary. If the Chesapeake and Ohio has a right to charge its losses under the contract of 1896 to its account as dealer, paying itself its full freight rates for the transportation of the coal in question, then it did not charge the New Haven Company less than its published rates on file, as alleged, and there was no violation of section 6 of the act.

Two charges are made—one that the Chesapeake and Ohio carried freight at less than its published rates and the other that the New Haven Company knowingly received rebates.

The Circuit Court, however, having held that the Chesapeake and Ohio had not carried freight at less than its published rates on file and had not committed the alleged discrimination forbidden by law, the case ended as to the New Haven Company, which could not, of course, have received the concession that had not been made.

The case as decided was one invented by the court, not presented by the pleadings, and one that should not have been considered at all. Even if that case had been properly before the court upon the pleadings, the decision thereof was not justified by a proper interpretation of the language of § 3 of the act. The court held that the Chesapeake and Ohio owed the New Haven Company $103,000 damages for failure to make deliveries under the prior contract. The transaction is legal and conducted in good faith, which at periods produced a net profit and at other times produced a loss to the Chesapeake and Ohio, the latter being estimated by the court as over 23 cents per ton on actual deliveries.

Under the provisions of the Interstate Commerce Act, in § 3, it held that the transaction between the Chesapeake and Ohio and the New Haven Company was null and void.

There was no charge in the petition that any offense had been committed by this appellant against § 3 of the act nor was there any in the affidavits of the relators.

While the Elkins Act provides remedies and procedure in cases arising under the act to regulate commerce, its terms must be looked to in determining general questions of pleading in such cases. *Missouri Pacific R. R. Co.* v. *United States,* 189 U. S. 284.

Section 3 of the Elkins Act provides that the Circuit Courts of the United States having jurisdiction, sitting in equity, shall proceed summarily to inquire into the circumstances upon such notice and in such manner as the court shall direct and without the formal pleadings applicable to ordinary suits in equity; but however informal the pleadings may be in interstate commerce proceedings, and however untechnical a

court is allowed to be under § 3 of the Elkins Act, it was not within the purview of that act to wipe away the landmarks and bulwarks of jurisprudence and to permit a cause uncharged to be heard and adjudicated; or to engraft upon a charge that is made one that is wholly different and to which no one has been summoned to answer.

Section 3 of the Interstate Commerce Act prohibits "undue or unreasonable preference or advantage" and "undue or unreasonable prejudice or disadvantage."

As there is nothing in the act which defines what shall be held to be due or undue, reasonable or unreasonable, such questions are questions, not of law, but of fact, *Texas and Pac. R. R. Co.* v. *Interstate C. C.*, 162 U. S. 219, the violation should be pleaded or alleged.

The intent of the legislative body, as expressed in the words of the statute, must control the courts in their construction of such statute. And in seeking this legislative intent resort may be had to every part of a statute, or, when there is more than one *in pari materia*, to the whole system. *Kohlsaat* v. *Murphy*, 96 U. S. 153, 159.

The only sections other than § 3 of the act to regulate commerce having any bearing on the policy and intent of the law refer only to: Transportation of passengers or property; Any service in connection therewith; Receiving, delivering, storage, or handling of such property; Terminal charges; Time schedules, carriage in different cars; False billing, false classification, false weighing or false report of weight; The furnishing of cars or other facilities for transportation.

The sole intent and spirit of the act is to provide for reasonable rates, equal charges, fair dealing and equal facilities in the "transportation of passengers and property." Section 3 must be read in the light of this spirit and intent, and in clause 2 not to legislate except in these particulars, the intent is plainly manifest.

The general subject and purpose of the statute, read as a whole will restrict the meaning of general words in some por-

tion of the statute in order to effectuate the true legislative intent. *Pennington* v. *Coxe*, 2 Cranch, 33, 52.

Where this intent is found to be limited to a narrower field than the use of certain general expressions would ordinarily imply if considered alone the courts do not hesitate to limit the scope of the general words and expressions so as to conform them to the real legislative intent as gathered from the whole act. *Brewer* v. *Blougher*, 14 Pet. 198; *Washington Market Co.* v. *Hoffman*, 101 U. S. 112, 116; *Petri* v. *Commercial Bank*, 142 U. S. 644; *United States* v. *Am. Bell Tel. Co.*, 159 U. S. 649; *United States* v. *Trans-Missouri Freight Assn.*, 166 U. S. 290, 320.

The words of general scope in § 3 should be so restricted in their meaning as to conform them to the general intent of Congress as disclosed by a consideration of the whole act.

Only common carriers engaged in interstate carriage are subject to the provisions of the act and they only when engaged in and about such carriage. *McKee* v. *United States*, 164 U. S. 287, 293.

This contention is further strengthened by an examination of the Elkins Act which is *in pari materia* with the original act. They both belong to the same "system."

Even if the court below was correct in its view that the provisions of § 3 were properly involved in the case, it erred in the interpretation it gave to those provisions and in the application it made of them to the case under consideration.

The only preference or advantage that is denounced by § 3 is that which is "undue or unreasonable," which cannot be imputed to an honest transaction made without any intent to violate any law and conforming itself to every principle of legal and moral rectitude and being fully understood by intelligent parties, each pursuing his own business. The reasonableness of the transaction to the Chesapeake and Ohio was governed by the honest consideration imputed to its president by the court below of endeavoring to find a market

for coal produced on his line. The relator who instigated these proceedings was offered the same rate for his coal. And the evidence shows there was not any discrimination.

The imputation of discrimination by the transaction in question against some or all of the persons concerned with Kanawha coal destined for points beyond the Capes, is not only unfounded; but is overwhelmingly disproved by the openness of it to general participation of the operators of the only place held to be discriminated against; and the proof of the negative is in the record, with only a vague imagination against it which can neither discover or suggest the name nor describe the particular person, company, firm, corporation, or locality or species of traffic which has been either preferred or prejudiced in any respect whatsoever.

The error in the Circuit Court's opinion was in not separating the advantages which must necessarily belong to the stimulation of trade and must necessarily and wholesomely attach to those who become wisely associated in it from that other class of advantages which flow from sinister devices and from improper considerations. An undue advantage must be founded upon an improper consideration. No improper consideration of any kind is suggested for the contract herein considered.

To hold that it would be possible for some one to suffer because of a particular transaction does not of necessity thereby make that transaction a discrimination of any kind such as the law has noticed or can notice. For, in fact and in legal contemplation, no person can suffer from a transaction which is honest and legal. If a railroad company takes away its works and track from a station, holders of property located in the abandoned vicinage must suffer. If a railroad company puts its shops or tracks at any place, adjoining property holders of necessity derive an advantage. But any loss suffered on the one hand is *damnum absque injuria* or rather is no damage at all in legal contemplation; and on the other hand any benefit derived is no discrimination.

The question presenting itself for decision is whether or not

a carrier acting in good faith and with entire honesty and making a contract unquestionable in its legal aspects, can by the mere fact that it loses upon that transaction thereby pass into a stage in which such loss may be legally regarded as an undue preference or advantage to the party who gets the benefit of such loss, or an undue prejudice or disadvantage to some unknown party who has not participated in the transaction. To state this question is to answer it.

No wrong can arise from any preference or advantage casually or incidentally flowing out of contracts legal and honest in themselves, for the reason that they are not undue. Nor is any person prejudiced by the granting of a preference or advantage that is not undue to another. It is the undue thing, and only the undue thing, that is prohibited by the Interstate Commerce Act.

The undue thing is "that which is not right;" "not legal or lawful;" "improper," as Bacon says, quoted in Webster's Dictionary.

- This is the sense in which the word "undue" is used in the statute and is the natural interpretation thereof.

The court below correctly overruled the motion for the enlargement of the injunctive decree. Every decree of a court should be specific and certain in its character, so that it should clearly apprise the parties to the proceedings of their rights and duties thereunder. This is particularly true of injunctive orders whereby parties are directed to, or are restrained from, the performance of specific acts.

This idea of certainty and definiteness is exemplified by the very definition of the term. 16 Am. & Eng. Ency. of Law, 342; 2 Story's Equity, 861; Spelling on Injunctions, § 3; Anderson's Law Dictionary, "Injunction;" High on Injunctions, § 1; *Robinson* v. *Clapp*, 65 Connecticut, 365; *Lyon* v. *Botchford*, 25 Hun, 57; *Sullivan* v. *Judah*, 4 Paige, 444; *Moal* v. *Holbein*, 2 Edw. Ch. 188; *Laurie* v. *Laurie*, 9 Paige Ch. 235; *So. Pac. Co.* v. *Colorado F. & I. Co.*, 42 C. C. A. 12; *Swift & Co.* v. *United States*, 196 U. S. 375.

So far as the terms of the injunction order that was entered in the case at bar is concerned, assuming that the case was correctly decided by the court below, it complies with the requirements for injunctive orders as laid down in the authorities above cited and is without objection. The enlargement urged by the Interstate Commerce Commission, however, would violate the "first principles of justice."

The injunctions in *United States* v. *Michigan Central,* 122 Fed. Rep. 544, and *Re Debs,* 158 U. S. 568, are not parallel.

In any consideration of this transaction the time at which it was made, the conditions under which it was made, and the gigantic nature of the commerce and industry of the country which have rendered such transactions indispensable to society, should not be overlooked. The time was one succeeding crises, when strikes, lockouts and paralysis of trade had deeply affected the whole nation. The conditions which had produced all manner of disorders were starvation and cold and riot and murder menacing the great centers. To stop coal or bread in a city was to organize anarchy.

The New Haven Railroad is a great company, moving thousands of tons of freight and thousands of passengers per day. It could not feed itself from hand to mouth. A day's stoppage of its trains meant far more than ruin to itself and paralysis to commerce; to the mails; to the bread of families, to remittances to and from banks; to pensions for invalids; to medicine for the sick; to concerns which embraced everybody of the human society to be served, and everything that concerns society. It meant distraction and damage. To provide coal for its enormous and myriad transactions the company had to make these great contracts.

If the reasoning of the lower court is sound, then such contracts can no longer be made with safety, however clothed with legality. If the validity, legality, fairness and commercial wisdom of a contract at the time of its execution do not give it a character that will survive changing commercial conditions, then the New Haven Road and other railroad companies

must tremble for the constancy and volume of their coal supply, and for the stability of their institution and its business. The commerce and the welfare of the people must tremble with them.

· The whole question comes back to the character of the original contract and the subsequent contract which is but an extension thereof. The Chesapeake and Ohio has a right, so far as this case or like cases may be concerned, to go into the coal business. If this be true then it has a perfect legal right to lose money in that business as it has to make a profit therein. It does not matter whether the contract here involved was profitable or unprofitable, the Chesapeake and Ohio always got its freight rate on the shipments made under it. What the Chesapeake and Ohio as a coal dealer got for its share of the proceeds is not a question with which the Federal statutes concern themselves. This is, of course, always assuming that the transaction, as here, is one of good faith and free from device to evade the law. *Interstate Com. Com.* v. *Baird*, 194 U. S. 44.

*Mr. John W. Griggs* also for New York, New Haven and Hartford Railroad Company:

The Circuit Court correctly decided that the Chesapeake and Ohio was, in fact, the vendor of the coal and must be treated as a carrier which purchased coal at its mines on its road for delivery to a purchaser in New England. It also correctly decided that the contract between the two companies was made in good faith; that there was no intention to violate or evade the provisions of the Interstate Commerce Act, and especially that there was no intention to carry at less than the published rates and also correctly decided that the provisions of neither § 2 nor § 6 of the act had been violated. The court held that unless the transaction was a ruse or device to carry at less than legal rates, or unless there was, directly or indirectly, a carriage at too low a rate, the provisions of the second section did not apply, and that the loss suffered

by the Chesapeake and Ohio on the contract could not be treated as carriage at too low a rate, as that would be to assert that the honest loss of the vendor-carrier must be treated as a reduction in freight rates, and not as dealer's loss, which would be incorrect.

The court below erred in holding that the railroad companies, especially the New Haven Company, were violating § 3 of the Interstate Commerce Act.

The complaint, neither in express terms nor by just legal inference, alleged any violation of § 3, and irrespective of the sufficiency of the complaint, the transactions in question did not constitute a violation of § 3.

This is not a case of shipper and carrier, but of vendor and vendee. The contract is to sell and deliver. Carriage is merely incidental to the contract of sale, and not the principal obligation of the vendor. Transportation is necessary merely in order to deliver the articles sold into the hands of the buyer.

It was not the purpose and is not within the fair scope of the Interstate Commerce Act to hold that merely incidental carriage performed, not as a part of the transportation business, but as the part of the business of a dealer, is governed by the act, where the transaction is honest and not intended as a ruse or device to defeat the statute and give undue or unreasonable preference or advantage to some particular person. Had Congress intended to make the act as broad and far-reaching as this, it would have used apt terms to express such an intention. The proper construction of the statute is that it applies to transportation as such when undertaken by a common carrier, exercising the functions of a carrier, and dealing, not with a vendee, but with a shipper of goods.

Even if the arrangement did give an advantage to the New Haven Company, it was not, under the circumstances disclosed in the record, an undue or unreasonable advantage. The contract of 1896 was not only made in good faith, but was intended to benefit generally all the producers of coal in the regions reached by the Chesapeake and Ohio. The transac-

tion was open and public, unobjected to for more than the full period of five years, and is objected to now only with reference to a very small proportion of the quantity of coal contracted to be furnished by that company to the New Haven Company. The contract worked no injury to any shipper of coal.

The decision of the Circuit Court accords to the vendor in this case the right to cease to perform its contract of sale, made in good faith, whenever the cost of the article, or the other cost items, go to such a point that the contract price does not equal, or practically equal, the cost items and the carrier's published freight rates. This is an extension by construction of the act, which is unjustified, unnecessary and impolitic.

The cases cited by the circuit judge as analogous are all cases where the contracts voluntarily abrogated by the carriers were contracts relating exclusively to transportation, and were made between the carrier and shippers of goods, not between the carrier and vendees.

The decree of the court below, which practically forbids the New Haven Company from recovering damages on a contract of purchase honestly entered into, merely because it incidentally and collaterally may affect some shippers of coal on the line of the Chesapeake and Ohio, is inequitable and unjust.

*Mr. Randolph Harrison,* with whom *Mr. A. R. Long* was on the brief, for the Chesapeake and Ohio Railway Company, appellee in No. 27:

The Commission's petition alleged that in delivering the coal in May and June, 1903, to complete the tonange called for by its contract with the New Haven Company the Chesapeake and Ohio was engaged in "the carriage of freight traffic at less than its published rates on file and was committing discrimination forbidden by law." There was no complaint that the published rates were excessive or unreasonable, but the petition was based upon the alleged violation of §§ 2 and 6, forbidding a departure from the published freight rate, or the charging of one person a higher rate than another for transporting

traffic of the same kind and under substantially similar circumstances. It is alleged that this discrimination is shown by the fact that the Chesapeake and Ohio did not realize out of the price obtained for the coal delivered in May and June, 1903, after payment of the cost of the same and the expense of transportation more than 23 cents per ton to represent the freight earned, whereas its published rate on file for the transportation of similar coal to tidewater was $1.45 per ton. The fact is that the Chesapeake and Ohio not only realized $39\frac{1}{2}$ cents net for each ton of coal delivered in May and June, 1903, over all costs and expense incident to its purchase and delivery, but also settled a liquidated claim against it amounting to $103,910.69, which amount should be taken into account in any just estimate of the consideration to be received on the one side and to be paid on the other for the coal furnished and to be furnished on account of the remnant due under its contract with the New Haven Road; but notwithstanding the fact that the charge of discrimination in freight rate set up in the petition is predicated solely on the price of said coal, the petition takes no account of said claim as a part of the consideration.

But it is apparent that this matter did not involve a question of transportation or rates. The New Haven Company was not a shipper of coal and had no interest in the freight charges of the Chesapeake and Ohio and could not be benefited or injured by the reduction or increase of such charges. The purpose of § 2 is to prevent unjust discrimination between shippers. *Tex. and Pac. R. R. Company* v. *I. C. C.*, 162 U. S. 219. There must be competition between shippers before there can be unjust discrimination. No such question is presented by this record. The New Haven Company made no contract for transportation, and the question of transportation as such is not involved in this case. The New Haven Road simply bought coal from the Chesapeake and Ohio as it would have bought it from any other seller at a fixed price to be delivered in its bins on its line. The Chesapeake and Ohio was the vendor of the coal as well as the carrier. The

Interstate Commerce Act does not forbid a carrier to be interested in a commodity transported by it—nor does it undertake to regulate or prescribe prices at which articles shall be sold, in order to realize established freight rates thereon. A carrier may in good faith engage in transporting a commodity of which it is the owner, or in which it is interested, and if it sustains a loss on the transaction, such loss would be in its capacity as dealer and not as carrier. *Haddock* v. *Del. &c. R. R. Co.,* 4 I. C. C. Rep. 266; *Coxe Bros.* v. *Lehigh &c. R. R. Co.,* 4 I. C. C. Rep. 535. In the former case, decided in 1890, it was held that when the carrier is the owner of or interested in the commodity transported, the provision against unjust discrimination, etc., does not apply; and that in such case the only question which could be inquired into was as to the reasonableness of the published rate.

The court having thus disposed of the case stated in the petition adverse to the contention of the Commission, nevertheless held that the contract of 1896, though valid when made, subsequently became invalid under § 3 of the Commerce Act by reason of the fact that the contract, because of the increased cost of delivering the coal, subsequently became unprofitable to the Chesapeake and Ohio and thereby resulted in an undue preference to the New Haven Company, and an undue prejudice to some party or parties unknown, and that the demand of said company in April, 1903, for $103,910.69 for damages for breach of said contract was, therefore, an illegal and unenforceable demand.

The conclusion of the court was not justified by the case stated or proved, as there was no allegation in the petition that this section had been violated, and no proof was introduced on that theory, nor was any fact alleged which, if proved, constituted an offense against said section. *Texas &c. R. R. Co.* v. *I. C. C.,* 162 U. S. 238.

The petition was based on the theory that §§ 2 and 6 had been violated. Section 2 relates solely to moneys exacted unjustly from the individual shipper in excess of moneys received

from any other shipper for a like service, and § 6 forbids a departure from the published freight rate. The court held that neither of these sections had been violated. The protection afforded by § 3 relates to any unjust advantage, or preference, given to any particular person, or to a locality, or with regard to any particular description of traffic, or to any unjust discrimination by one carrier against another carrier as to rates, charges or facilities in operating connecting lines, or in making joint rates over connecting lines.

None of these offenses is charged, or proved, nor was it contended that the New Haven Company received any preference such as is contemplated by this section.

The conclusion of the court that a "particular kind of traffic" had suffered disadvantage is based upon a finding of fact that "some person or persons" had been prejudiced. But this finding of fact, which is wholly indefinite as to persons, and the time, place, character, extent and manner of the supposed prejudice, is qualified by the statement of the court that it is "unable to say who suffered" the supposed disadvantage. A finding involving penal liability should be supported by clear and specific proof, and the court could not be in doubt as to facts essential to constitute the offense if its finding of fact were based on sufficient evidence. If the finding of fact was not supported by sufficient evidence the conclusion based on it falls with it.

The cases cited by the court in support of this conclusion are not analogous to the case at bar. They were cases wherein the contracts were held to be invalid in their inception, or where, relating to a matter subject to legislative control, they conflicted with legislation subsequently enacted regulating the subject of said contracts, or where there was a conflict between a state statute and the National law operating on the same subject matter, in which latter case the state statute had to yield. But no case holds that a contract, valid when made, can be rendered invalid by a change of circumstances or conditions affecting its results.

If the conclusion of the court be sound, it is equivalent to a
denial of the right to a railroad company to be the carrier of
coal or any other traffic as interstate commerce of which it is
the owner, as no one would be willing to enter upon a contract
which depended for its stability upon such an uncertain ele-
ment as the cost of labor or other circumstances materially
affecting its results.   The court erred in holding the contract
of 1896 void under § 3 of the Interstate Commerce Act.

The lower court was right in not entering the omnibus in-
junction prayed for by the Commission.   See cases cited in
argument for New Haven Company.

*Mr. Assistant Attorney General McReynolds*, with whom
*Mr. William A. Day* was on the brief, for the Interstate Com-
merce Commission, appellee in No. 24 and. appellant in
No. 27:

The Interstate Commerce Act as amended provides for the
enforcement and observance of published rates upon peti-
tion filed by the Commission by proper orders, writs and
process.

It is important to know how broad injunctions issued in
proceedings under this act should be, and to secure an au-
thoritative ruling the question is here presented.

The Interstate Commerce Act was intended to cut up by
the roots the entire system of rebates and discriminations and
to put all shippers on an absolute equality.   *U. P. Railway
Co.* v. *Goodridge*, 149 U. S. 680, 690.

The Elkins Act was intended to strengthen the former stat-
utes and to give the courts power to enforce them.   It should,
of course, be interpreted with that end in view.   If when a
railroad is detected in willfully violating the law by transport-
ing any article at less than schedule rates the only remedy in
equity is to restrain it from thereafter so carrying that article
for that person, little may be accomplished.   But if under the
circumstances suggested a broad order forbidding transporta-
tion of the article for anybody must be issued, the results may

be much more wholesome, and the true purpose of the law. may be more fully effectuated.

In the case of *In re Debs*, 158 U. S. 564, 570, an injunction issued commanding the defendants and all persons combining and conspiring with them, and all other persons whomsoever, absolutely to desist and refrain from in any way or manner interfering with, hindering, obstructing, or stopping any of the business of any of the railroads referred to.

Debs violated the order and was punished for contempt. If strikers may properly be restrained by such a sweeping injunction, why may not a railroad be enjoined from carrying coal for anybody below published rates?

The case of *Swift and Company* v. *United States*, 196 U. S. 375, did not arise under the Interstate Commerce Act and was controlled by different principles.   The defendant in that case was in a different position from the common carriers in this case.

Respondents set up the 1896 agreement and transactions under it to justify what otherwise would be manifestly illegal. They say that as the Chesapeake and Ohio Railway has admitted the alleged liability the legality of the same cannot be questioned in this proceeding.

No extended argument is required to show that a railroad cannot avoid the statutes to regulate commerce or escape its public duties by simply admitting a liability which has no foundation in law.   The public is vitally interested that no common carrier should admit a baseless liability, for in the last analysis the public will probably have to pay it.   A defense bottomed on the recognition of a liability springing from a void contract would be clearly without merit.

In *Union Pacific Railway Co.* v. *Goodridge*, 149 U. S. 680, 691,—a proceeding under a provision of the Colorado statute in substantial accord with the Interstate Commerce Act—the railway company, to justify allowance of rebates, relied on an unliquidated claim for damages against it held by the consignee.   This court said that to sustain such a defense would

open the door to the grossest frauds and held that such a contract could not be supported.

The agreement of 1896 was at most a gratuitous option or offer by the Chesapeake and Ohio Railway to sell and deliver coal, given with the evident hope of getting business, and subject to revocation at any time before acceptance.

It was *ultra vires* of the Chesapeake and Ohio Railway to contract with the New Haven Railroad to sell and deliver coal. The railway owned no coal and its charter gave it no right to carry on the business of dealing in such merchandise.

All doubts with regard to the authority granted in a corporate charter are to be resolved against the corporation.  *Louisville & Nashville Railroad Co.* v. *Kentucky,* 161 U. S. 677, 685.

Railroad corporations possess the powers which are expressly conferred by their charters, together with such powers as are fairly incidental thereto.  The general rule is that a contract made by a corporation beyond the scope of its powers, express or implied, on a proper construction of its charter, cannot be enforced or rendered enforceable by the application of the doctrine of estoppel.  *Union Pacific Railway Company* v. *Chicago &c. Railway Co.,* 163 U. S. 564, 581; *Central Transportation Co.* v. *Pullman's Car Co.,* 139 U. S. 24.

If performance of the 1896 agreement required the Chesapeake and Ohio Railway to do anything prohibited by law its duty was not to perform and no liability for damages could have arisen because of the failure.  *Gulf, Colorado &c. Ry.* v. *Hefley,* 158 U. S. 98, 102; *Southern Railway Co.* v. *Wilcox,* 99 Virginia, 394, 408, 409; *Fitzgerald & Co.* v. *Grand Trunk Railroad Co.,* 63 Vermont, 169; *Savannah, F. & W. Ry. Co.* v. *Bundick* (Ga.), 21 S. E. Rep. 995; *Southern Railway Co.* v. *Harrison* (Ala.), 43 L. R. A. 385; *Bullard* v. *Northern Pacific Railroad Co.,* 10 Montana, 168.

Transactions under the 1896 agreement show that the net results to the carrying company were insufficient to pay freight according to published schedules.  The public is not less damnified when a carrier sustains loss upon a contract for de-

livery of coal because the same is charged to merchandise rather than to the freight account; and it appears absurd to say a railroad may render the selfsame transaction legal or illegal by the way it keeps its books. Transportation is the railroad's business and from that source its earnings come. Other permissible transactions must be regarded as incidental and intended to enable it to earn freight, and if loss occurs it should be charged to the freight, for the transportation is, in a broad sense, the only thing contributed by the carriers.

The deleterious effect of permitting railroads to act as dealers in merchandise is lucidly pointed out by the vice-chancellor in *The Attorney General* v. *The Great Northern Railway Company*, 38 Law Journal, 794 (New Series, vol. 29); and by Cockburn, C. J., in *Baxendale* v. *Great Western Ry. Co.*, 28 L. J. C. P. 81; 5 C. B. (N. S.) 336. See also *Haddock* v. *Delaware, Lackawanna & Western Railway Company*, opinion by Cooley, chairman, 4 I. C. C. Rep., 296; *Coxe Bros. & Co.* v. *Lehigh Valley Railroad Co.*, 4 I. C. C. Rep., 535; *Grain Rate Case*, 7 I. C. C. Rep., 33; 1 Wood on Railroads, Minor's ed., 652, and cases cited; *Baxendale* v. *North Devon Ry. Co.*, 3 C. B. (N. S.) 324.

If the claim presented by the New Haven Railroad was an indefinite and unadjusted one for damages *Union Pacific Railway* v. *Goodridge, supra*, seems conclusive against the contention that it can be treated as part of the consideration for carriage.

MR. JUSTICE WHITE delivered the opinion of the court.

Following an inquiry begun in consequence of a complaint to it made, the Interstate Commerce Commission, through the Attorney General of the United States, filed under the act to further regulate commerce (32 Stat. 847), in the Circuit Court of the United States for the Western District of Virginia, this proceeding against the Chesapeake and Ohio Railway Company,

a Virginia corporation, and the New York, New Haven and
Hartford Railroad Company, a corporation of the State of
Connecticut. In this opinion we shall hereafter respectively
speak of the parties as the Commission, the Chesapeake and
Ohio, and the New Haven. The petition averred that the
Chesapeake and Ohio was engaged in the carriage of coal as
interstate traffic between the Kanawha district of West Vir-
ginia and Newport News, Virginia, for delivery thence to the
New Haven in Connecticut, and charged that the traffic was
being moved at less than the published rates, and in such a way
as to produce a discrimination in favor of the New Haven road
and against others, all in violation of the act to regulate com-
merce and the amendments thereto. Specifying the grounds
of the complaint, it was alleged that in the spring of 1903 the
Chesapeake and Ohio made a verbal agreement with the New
Haven to sell to that road sixty thousand tons of coal, to be
carried from the Kanawha district to Newport News, and
thence by water to Connecticut, for delivery to the buyer at
$2.75 per ton, and that a considerable portion had already been
delivered and the remainder was in process of delivery. It was
averred that the price of the coal at the mines where the Ches-
apeake and Ohio bought it and the cost of transportation from
Newport News to Connecticut would aggregate $2.47 per ton,
thus leaving to the Chesapeake and Ohio only about twenty-
eight cents a ton for carrying the coal from the Kanawha dis-
trict to Newport News, whilst the published tariff for like car-
riage from the same district was $1.45 per ton.

Referring to the developments before the Commission, and
annexing as part thereof the testimony taken on such hearing
and the documents connected therewith, the petition further al-
leged that the Chesapeake and Ohio asserted that, although the
total price which it received for the coal covered by the verbal
agreement was less than the total outlay in delivering the coal,
including its published rates, such fact did not amount to a
departure from the published rates, and was not a discrimina-
tion for two reasons: First. Because if such difference existed,

it was a loss suffered by the Chesapeake and Ohio, not from taking less than its published rates, but because it had received less as purchaser than the coal had cost. Second. That even if it had not the lawful right thus to impute the payment of the price of the coal, the Chesapeake and Ohio had, in fact, received much more for the coal than the price in money agreed on, because, at the time the verbal agreement to sell was made the New Haven had a claim exceeding one hundred thousand dollars against the Chesapeake and Ohio, arising from a previous written contract to deliver coal, which was to be extinguished by the completion of the delivery of the coal, and this caused that price largely to exceed the cost of the coal to the Chesapeake and Ohio, including its published rates. Averring that the prior contract was in itself void because it also embodied an agreement to take less than the published rates and was discriminating, it was charged that the New Haven had entered into both agreements with the Chesapeake and Ohio, knowing that they were in violation of the Interstate Commerce Law. The prayer was that the Chesapeake and Ohio and the New Haven be made parties; that both roads be enjoined, the one from further executing the verbal agreement to deliver coal and the other from seeking to enforce it; that the Chesapeake and Ohio be enjoined from "accepting or receiving any rebate, concession or discrimination in respect of the transportation of any property in interstate or foreign commerce carried by it," and be, moreover, enjoined from "doing anything whatever, whereby coal or any other property shall, by any device whatever, be transported . . . at a less rate than named in the tariffs published and filed by such carrier, as is required by the act to regulate commerce and acts amendatory thereof or supplementary thereto, or whereby any other advantage may be given or discrimination practiced." And that the New Haven road "be enjoined and restrained from accepting or receiving any rebate, concession or discrimination in respect of the transportation of any property in interstate or foreign commerce carried by it."

A preliminary restraining order was issued conforming to the prayer of the petition. The Chesapeake and Ohio by its answer admitted that it had made, in the spring of 1903, a verbal agreement with the New Haven road for about sixty thousand. tons of Kanawha coal for the price alleged in the petition, to be transported by it to Newport News, and thence delivered by ocean transportation to the New Haven in Connecticut. It was admitted that the purchase price agreed to be paid was less than the market price of the coal plus the published rates, and the cost of transportation and delivery from Newport News to Connecticut, but it was averred that this was only apparently the case, because the contract to sell included the discharge of a debt of about one hundred thousand dollars, arising from the previous written contract to which the petition referred. The validity of both the previous written contract and the later verbal agreement was averred. The right of the Chesapeake and Ohio to buy and sell coal, and to impute any loss on the sale of the coal to itself as dealer instead of to itself as a carrier, was averred. Both the original contract and the one of 1903 were averred to have been made in good faith, not with any intention to avoid the published rates, and it was charged that at about the time the original contract was made arrangements had been made by the railroad for a rate of transportation from Newport News to Connecticut which would have caused the contract price to be adequate to pay the market price of the coal and all other charges, including the published rates, but that, subsequently thereto, the persons with whom this contract for transportation was made had violated their agreement, and that by strikes the price of coal had advanced, and thereby the loss of one hundred thousand dollars to the Chesapeake and Ohio was occasioned.

The New Haven road in its answer asserted its good faith in making both the original contract and the verbal agreement. It alleged that by the original contract it was a mere purchaser of coal from the Chesapeake and Ohio, and not a shipper over that road; that the coal bought was intended for its own use

in the operation of its railroad; that it had no knowledge of the price which the Chesapeake and Ohio would be obliged to pay for the coal or the sum which it would cost that road to deliver it, and therefore had no knowledge that the total cost would not equal the market price of the coal, the cost of delivery and the published rate of the Chesapeake and Ohio. It averred the validity of the agreement, the legality of the debt of one hundred thousand dollars which resulted from it, and charged that, taking that debt into consideration, the sum which it paid the Chesapeake and Ohio for the coal under the 1903 verbal agreement largely exceeded the market price and the cost of delivery, including the published rates of the Chesapeake and Ohio. It denied that there was any departure from the public rates or any discrimination, asserted that at the time the original contract was made the price was sufficient to have enabled the Chesapeake and Ohio to perform the contract without losing anything either as a seller or as a carrier, and that if in execution of the contract a condition arose where a loss was suffered by the Chesapeake and Ohio in either capacity, it was caused by subsequent events which could not affect the validity of the contract when made, and especially denied that in any way, directly or indirectly, had it knowingly lent itself to any discrimination, or any taking by the Chesapeake and Ohio of less than its published rates.

The case was heard on the testimony taken in the proceeding before the Commission and the documents forming a part of the same, and upon further documents and testimony stipulated by counsel.

For reasons to which we shall hereafter have occasion to advert, the court held that, considering both the original contract and the verbal agreement of 1903, there was no violation of the provisions of the second and sixth sections of the act to regulate commerce, forbidding the taking of less than the published rates. It, however, held that the contracts amounted to an undue discrimination and a violation of the third section of the act. The court, hence, permanently enjoined the Ches-

apeake and Ohio from discharging any obligation arising from the original contract of 1896, and from further executing or attempting to execute, in any manner whatever, directly or indirectly, the verbal agreement of 1903, and it permanently enjoined the New Haven from asserting or attempting to enforce any claim arising from the contract of 1896, or in any manner, directly or indirectly, attempting to enforce the verbal agreement of 1903. Thereafter the court denied a request made by the Commission, that the injunction be expanded so as in general terms to command the Chesapeake and Ohio perpetually to observe in the future its published rates.

The New Haven appealed. The Commission also prosecuted a cross appeal because of the refusal of the court to grant its prayer to make the injunction against the Chesapeake and Ohio general in its nature, and that company, in an elaborate and separate printed argument in its own behalf, assails the judgment below on the merits and, in effect, asks its reversal on the merits.

It is apparent from the case as thus stated that, in order to decide the issues which arise, we may not confine our attention to the verbal agreement of 1903, the execution of which it was the immediate object of the proceeding to enjoin, but must consider the prior contract of 1896, since primarily the rights, if any, which arose under the verbal agreement, are inextricably involved in and dependent upon the contract of 1896. In other words, the controversy as considered by the Commission on the inquiry by it conducted and as decided below, and as here presented, involves an analysis of all the dealings under both contracts and the legal rights, if any, which arose from them. We must, therefore, consider the subject in this aspect, and to do so we state at once the facts which are admitted or which are indisputably established, reserving such questions of fact as are in dispute for separate consideration when we approach the legal propositions which arise from the undisputed facts.

The Chesapeake and Ohio, chartered by the State of Virginia,

operates a road which reaches both the New River and the Kanawha coal fields of West Virginia, and extends to Newport News. The New Haven, chartered by the State of Connecticut, operates a road principally situated in New England. On December 3, 1896, these two roads entered into a written contract, the one to sell and the other to buy between July 1, 1897, and July 1, 1902, not to exceed two million gross tons of bituminous coal to be taken from the line of the Chesapeake and Ohio road; deliveries to be made not exceeding four hundred thousand tons per annum. The price agreed upon was $2.75 per gross ton, New Haven basis, settlement to be made monthly. The coal was to be delivered by the seller on the line of the New Haven. The contract is reproduced in the margin.[1]

The Chesapeake and Ohio, not in its own name but through others who really although not ostensibly acted for it, made a contract with operators in the New River district of West Virginia, for the delivery to it of the coal to fulfill the contract which had been made with the New Haven. In consequence

---

[1] Contract made between the Chesapeake and Ohio Railway Company and the New York, New Haven and Hartford Railroad Company.

Said Chesapeake and Ohio Railway Company, for the consideration hereinafter mentioned, hereby agrees to furnish to said railroad company not to exceed two million gross tons of bituminous coal from its line in such quantities monthly as wanted from July 1, 1897, to July 1, 1902, without charge for demurrage. Deliveries to be made not exceeding four hundred thousand tons per annum.

And said Chesapeake and Ohio Railway Company further agrees that all said bituminous coal shall be of the best quality, first-class in every respect, and satisfactory to said railroad company, and said railway company has the right to terminate this contract at any time if said bituminous coal be of poor quality or if its delivery be unnecessarily delayed.

And said Chesapeake and Ohio Railway Company further agrees to deliver all said bituminous coal to said railroad company in its bins at such ports upon its lines as required by the monthly requisitions of its purchasing agent.

In consideration of the faithful performance by the said Chesapeake and Ohio Railway Company of all its agreements herein contained, said railroad company agrees to pay for said bituminous coal at the rate of two and seventy-five one-hundredths dollars per gross ton, New Haven basis, settlement to be made *monthly.*

of failure of some of the operators to perform their part of the contract, changes were made at various times, which it is unnecessary to note. Deliveries of the coal were made to the New Haven as required up to the winter of 1900–1901, when, because of strikes and other difficulties, delivery ceased and the New Haven bought coal in the open market and presented to the Chesapeake and Ohio a bill for the increased price which it had paid, and the Chesapeake and Ohio paid one hundred and sixty thousand dollars to cover such loss. Subsequently in 1902 further strikes supervened and deliveries again ceased, at a time when about sixty thousand tons remained yet to be delivered. The New Haven again presented a bill for damages amounting to one hundred and three thousand dollars. Thereupon the verbal agreement of 1903 was made, by which it was provided that the shortage of sixty thousand tons upon the original contract might be discharged by delivery on the part of the Chesapeake and Ohio of that amount of coal from the Kanawha district at the contract price of $2.75, and when this delivery was consummated it was agreed that the Chesapeake and Ohio would be absolutely relieved from the payment of the damage claim just referred to.

At the time this verbal agreement was made the contract price was, leaving out of view the claim for damages, inadequate to pay the market price, as admitted by the pleadings, of the coal plus the published rates of the Chesapeake and Ohio to Newport News, and the charges thence to the point of delivery. To put itself in a position to carry out the agreement

Said railway company has the right to cancel any and all portions of said quantity of bituminous coal remaining undelivered on July 1, 1902.

Witness the names of the parties hereto this the 3d day of December, 1896.

CHESAPEAKE AND OHIO RAILWAY COMPANY,

By M. E. INGALLS, President.

THE NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY,

By C. E. MELLEN, Second Vice President.

For value received, I hereby guarantee that the Chesapeake and Ohio Railway Company shall not fail to deliver coal on account of strikes.

J. PIERPONT MORGAN.

an individual who represented the Chesapeake and Ohio made contracts in his own name with operators in the Kanawha district to furnish the desired coal.   Without stopping to state the particular methods of accounting by which the result was accomplished, it is indisputable that the Chesapeake and Ohio bore the loss arising from the difference between the contract price, the price of the coal at the mines, the published rate to Newport News, and the cost of transporting thence to the point of delivery.

Undoubtedly long prior to the making of the first contract the Chesapeake and Ohio, besides its business as a carrier, bought and sold coal.   This business was carried on by the company from about 1874 up to the time of the making of the contract of 1896, as testified by the president who made that contract, as follows:

"The coal was handled by a separate and distinct department of the railway company, the mine operators delivering for an agreed price at the mines to the coal agent of the railway company all coal mined by them, the net result realized from the selling price of the coal representing the freight earned by the railway company."

And the same official testified that he made the contract of 1896 as a continuation of this system.

In 1895, however, the State of West Virginia passed "An act to prevent railroad companies from buying or selling coal or coke and to prevent discrimination."   The first section of this act made it unlawful for any railroad corporation to engage directly or indirectly in the business of buying and selling coal or coke.   In consequence of this act, prior to the making of the contract of 1896, the coal department of the railroad was abolished.   And it was the existence of the West Virginia statute which caused the Chesapeake and Ohio, when it contracted with operators in West Virginia to procure as to both contracts the coal for delivery to the New Haven to do so not in its own name but through another.

Before applying to these undisputed facts the legal question

arising for decision, we must determine a question of fact as
to which there is some dispute; that is, was the price at which
the Chesapeake and Ohio contracted in 1896 to sell the coal to
the New Haven sufficient to pay the cost of the coal at the
mines, as well as the expense of delivery, including the pub-
lished freight rate? Without stopping to go into the evidence
we content ourselves with saying that we think the court below
correctly held that the price was not adequate to accomplish
these purposes, and that from the inception of delivery under
the contract and during the whole period thereof, except for
a brief time, caused by a lowering of the freight rates, the
contract price was inadequate to net the railroad its proper
legal tariff.

We are brought then to determine whether the contract made
in 1896 for the two million tons of coal was void because in
conflict with the act to regulate commerce and its amendments.
In approaching the consideration of the act to regulate com-
merce, we for the moment put out of view the provisions of
the West Virginia statute and its influence upon the validity
of the contract made in West Virginia for the purpose of ac-
quiring the coal which the Chesapeake and Ohio had obligated
itself to deliver. We shall also assume for the purpose of the
inquiry that the Chesapeake and Ohio, although not expressly
authorized, was not prohibited by its Virginia charter from
buying and selling and transporting the coal in which it dealt.
The case, therefore, will be considered solely in the light of the
operation and effect of the provisions of the act to regulate
commerce, and we shall not direct our attention to expressly
determining whether the assertion by a carrier of a right to
deal in the products which it transports would not be so re-
pugnant to the general duty resting on the carrier as to cause
the exertion of the power to deal in the products which it
transports to be unlawful, irrespective of statutory restrictions.

The question, therefore, to be decided is this: Has a carrier
engaged in interstate commerce the power to contract to sell
and transport in completion of the contract the commodity

sold, when the price stipulated in the contract does not pay the cost of purchase, the cost of delivery and the published freight rates?

The previous decisions of this court concerning the Interstate Commerce Act do not afford much aid in determining this question. This is the case, because, although that act was adopted in 1887, and questions concerning the import of the act have been often here, such questions have not generally involved the operation and effect of the act concerning the command that published rates be adhered to, and the prohibitions against discrimination, favoritism or rebates, but have mainly concerned the meaning of the act in other respects, that is, involved deciding whether powers asserted as to other subjects were vested by the act in the Interstate Commerce Commission.

There are several leading cases decided by the Commission, which are relied upon by the two railroads, directly relating to the question we have stated, but, as we shall have occasion hereafter to weigh their import, we shall not now pause to analyze and apply them.

It cannot be challenged that the great purpose of the act to regulate commerce, whilst seeking to prevent unjust and unreasonable rates, was to secure equality of rates as to all and to destroy favoritism, these last being accomplished by requiring the publication of tariffs and by prohibiting secret departures from such tariffs, and forbidding rebates, preferences and all other forms of undue discrimination. To this extent and for these purposes the statute was remedial and is, therefore, entitled to receive that interpretation which reasonably accomplishes the great public purpose which it was enacted to subserve. That a carrier engaged in interstate commerce becomes subject as to such commerce to the commands of the statute, and may not set its provisions at naught whatever otherwise may be its power when carrying on commerce not interstate in character, cannot in reason be denied. Now, in view of the positive command of the second section of the act, that no departure from the published rate shall be made, "di-

rectly or indirectly, " how can it in reason be held that a carrier may take itself from, out the statute in every case by simply electing to be a dealer and transport a commodity in that character? For, of course, if a carrier has a right to disregard the published rates by resorting to a particular form of dealing, it must follow that there is no obligation on the part of a carrier to adhere to the rates, because doing so is merely voluntary. The all-embracing prohibition against either directly or indirectly charging less than the published rates shows that the purpose of the statute was to make the prohibition applicable to every method of dealing by a carrier by which the forbidden result could be brought about. If the public purpose which the statute was intended to accomplish be borne in mind, its meaning becomes, if possible, clearer. What was that purpose? It was to compel the carrier as a public agent to give equal treatment to all. Now if by the mere fact of purchasing and selling merchandise to be transported a carrier is endowed with the power of disregarding the published rate, it becomes apparent that the carrier possesses the right to treat the owners of like commodities by entirely different rules. That is to say, the existence of such a power in its essence would enable a carrier, if it chose to do so, to select the favored persons from whom he would buy and the favored persons to whom he would sell, thus giving such persons an advantage over every other, and leading to a monopolization in the hands of such persons of all the products as to which the carrier chose to deal. Indeed the inevitable result of the possession of such a right by a carrier would be to enable it, if it chose to exercise the power, to concentrate in its own hands the products which were held for shipment along its line, and to make it, therefore, the sole purchaser thereof and the sole seller at the place where the products were to be marketed; in other words, to create an absolute monopoly. To illustrate: If a carrier may by becoming a dealer buy property for transportation to a market and eliminate the cost of transportation to such market, a faculty possessed by no other owner of the commodity, it must

result that the carrier would be in a position where no other person could ship the commodity on equal terms with the carrier in its capacity of dealer. No other person owning the commodity being thus able to ship on equal terms, it would result that the owners of such commodity would not be able to ship, but would be compelled to sell to the carrier. And as by the departure from the tariff rates the person to whom the carrier might elect to sell would be able to buy at a price less than any other person could sell for, it would follow that such person so selected by the carrier would have a monopoly in the market to which the goods were transported. And that the result arising from an admission of the asserted power of the carrier as a dealer to disregard the published rates conduces immediately and not merely remotely to the production of the injurious results stated, is not only demonstrated by the very nature of things, but is established to be the case by the facts indisputably shown on this record. For here it is unquestioned that the Chesapeake and Ohio, as a result of its being a dealer, had become, long prior to the adoption of the Interstate Commerce Law and continued to be thereafter, up to the passage of the West Virginia statute prohibiting a carrier from dealing in coal, virtually the sole purchaser and seller of all the coal produced along the line of its road. That this result was not merely accidental, but was in effect engendered by the power of the carrier to deal and transport a commodity, is illustrated by the case of *The Attorney General* v. *The Great Northern Railway Company,* 29 Law Journal (N. S. Equity), 794. In that case Vice Chancellor Kindersley was called upon to determine whether dealing in coal by the railway company was illegal, because incompatible with its duties as a public carrier and calculated to inflict an injury upon the public. In deciding that the act of Parliament granting the charter to operate the railway implied a prohibition against the company's engaging in any other business, the reason for the rule was thus expressed (p. 798):

    ". . . These large companies, joint stock companies gen-

erally, for whatever purpose established, and more particularly railway companies, are armed with powers of raising and possessing large sums of money—large amounts of property—and if they were to apply that money, or that property, to purposes other than those for which they were constituted, they might very much injure the interests of the public in various ways."

Illustrating the danger to the public, as established by the case before him, the Vice Chancellor said (p. 799):

".Here we find this company, having the traffic from the north of England, where the great coal fields are (at least some of the principal coal fields), supplying the country with coal, or capable of supplying it; this company buys the coal, which gives to the company an interest in checking, as much as possible, those who will not deal with them; and it is quite clear that it is possible, by the mode in which this company may (I will not say has),—but by the mode in which this company may exercise such powers as either it has or assumes to have—this company may get into their hands the traffic, that is, the dealing in all the coal in the large districts supplying coal to the country. They have to a considerable extent done so, and there is no reason why it should not go on progressing. I observe that in the eight (?) years from 1852 to 1857, inclusive, the amount of their coal business has increased from 73,000 tons to 794,000 tons; and there is no reason, as the affidavits show, why they should not—there is great danger that they may—get into their hands the entire business in the coal of all that district of country. If they can do that with regard to coal, what is to prevent their doing it with every species of agricultural produce all along the line? Why should they not become purchasers of corn, of all kinds of beasts, and of sheep, and every species of agricultural produce, and become great dealers in the supply of edibles to the markets of London; and why not every other species of commodity that is produced in every part of the country from which or to which their railway runs? I do not know where it is to stop, if the argument on the part of the company is to prevail. There is, therefore,

great detriment to the interests of the public, for this reason, taking merely the article of coal."

It is apparent that the construction of the statute which is now claimed by the carriers would, if adopted, not only destroy its entire remedial efficacy, but would cause the provisions of the statute to accentuate and multiply the very wrongs which it was enacted to prevent.

Without a statutory requirement as to publication of rates and the imposition of a duty to adhere to the rates as published, individual action of the shippers as between themselves and in their dealings with the carrier would have full play, and thereby every shipper would have the opportunity to procure such concessions as might result from favoritism or other causes. Interpreting the prohibitions of the statute as it is contended they should be, it would follow that every individual would be bound by the published tariff, and the carrier alone would be free to disregard it. Thus the statute, whilst subjecting the public to the prohibitions, would exempt the carrier and would thereby enormously increase the opportunities of the latter to do the wrongs which the statute was enacted to prevent.

And the considerations previously stated serve also to demonstrate that the prohibitions of the act to regulate commerce concerning "undue or unreasonable preference or advantage," "undue or unreasonable prejudice or disadvantage," and "unjust discrimination" are in conflict with the asserted right of a carrier to become a dealer in commodities which it transports, and as such dealer to sell at a price less than the cost and the published rates. Certain also is it, when the reasons previously stated are applied to those prohibitions of the statute the possession of the power by a carrier to deal in merchandise and to sell and transport at less than published rates, would not only destroy the remedy intended to be afforded by the provisions in question, but would cause the statute to fructify the growth of the wrongs which it was intended to extirpate. In a general sense the considerations which we have previously stated, moreover, dispose of all the contentions

urged at bar to establish the right of the carrier to become a dealer under the circumstances stated. Even although it may give rise to some repetition, we more particularly notice the various contentions.

(a) It is said that when a carrier sells an article which it has purchased and transports that article for delivery, it is both a dealer and a carrier. When, therefore, the price received for the commodity is adequate to pay the published freight rate and something over, the command of the statute as to adherence to the published rates is complied with, because the price will be imputed to the freight rate, and the loss, if any, attributed to the company in its capacity as dealer and not as a carrier. This simply asserts the proposition which we have disposed of, that a carrier possesses the power, by the form in which he deals, to render the prohibitions of the act ineffective, since it implies the right of a carrier to shut off inquiry as to the real result of a particular transaction on the published rates, and thereby to obtain the power of disregarding the prohibitions of the statute.

(b) It is said that, as in the case in hand, it is shown that there was no intention on the part of the carrier in making the sale of the coal to violate the prohibitions of the statute, and, on the contrary, as the proof shows an arrangement made by the carrier for transporting the coal from Newport News to Connecticut, which, if it had been carried out, would have provided for the full published rate, therefore an honest contract made by the carrier should not be stricken down because of things over which the carrier had no control. The proposition involves both an unfounded assumption of fact and an unwarranted implication of law. It is true the court below found that the proof did not justify the inference that the Chesapeake and Ohio had, in 1896, made the contract to sell the coal to the New Haven with the purpose of avoiding a compliance with the published rates. But in this conclusion of fact we cannot agree. Whilst it may be that the proof establishes that the contract for the sale of coal was not made as a mere device

for avoiding the operation of the statute, we think the proof
leaves no doubt that, in making the contract in question, the
Chesapeake and Ohio was wholly indifferent to and did not
concern itself with the prohibitions of the statute, of which,
of course, it must be assumed, to have had full knowledge.
As we have seen, the president of the Chesapeake and Ohio,
by whom the corporation was represented in making the con-
tract, expressly testified that from the beginning that corpora-
tion had pursued the policy of acquiring all the coal mined on
its line and sold it, relying upon the net result of such sales
for its freight compensation, and that the particular contract
was made in continuation of that policy.   We find it impos-
sible to conclude, from the proof, that the Chesapeake and
Ohio could have made a contract for so large an amount of
coal, to be delivered over so long a period, without taking into
view the existing prices and the cost necessarily to be occa-
sioned by the delivery of the coal, if the full published freight
rates were to be realized.   Indeed, the proof leaves no doubt
upon our minds that, in making the contract, the Chesapeake
and Ohio sought to accomplish results which it deemed bene-
ficial by means which it considered effectual, even although
resort to such means was prohibited by the Interstate Com-
merce Act.   In other words, we think it is established beyond
doubt that, desiring to stimulate the production of coal along
its line and thereby, as it conceived, to increase the carriage
of that commodity and to benefit the railroad and those living
along its line by the reflex prosperity which it was deemed
would arise from giving a stimulus to an industry tributary to
the railroad, the Chesapeake and Ohio bought and sold the
coal without reference to whether the net result to it would
realize its published rates.   And it would seem that this means
of stimulating the industry in question was resorted to instead
of attempting to bring about the same result by a lowering of
the published rates, because to have so done would have en-
gendered disparity between coal rates and the tariff on all the
other articles contained in the same classification, and would

besides have caused other and competing roads to make a sim-
ilar reduction on the published rates, and thereby would have
frustrated the very advantage to itself and those along its lines
which the Chesapeake and Ohio deemed it was bringing about
by the method pursued. That is to say, we think it is shown
that the mode of dealing adopted was simply the result of a
disregard by the Chesapeake and Ohio of the economic concep-
tions upon which the Interstate Commerce Law rests, and a
substitution in their stead of the conceptions of the Chesapeake
and Ohio, as to what was best for itself and for the public.
Further, as the prohibition of the Interstate Commerce Act is
ever operative, even if the facts established that at the partic-
ular time the contract was made, considering the then cost of
coal and other proper items, the net published tariff of rates
would have been realized by the Chesapeake and Ohio from
the contract, which is not the case, it is apparent that the de-
liveries under the contract came under the prohibition of the
statute whenever for any cause, such as the enhanced cost of
the coal at the mines, an increase in the cost of the ocean car-
riage, etc., the gross sum realized was not sufficient to net the
Chesapeake and Ohio its published tariff of rates. This must
be the case in order to give vitality to the prohibitions of the
Interstate Commerce Act against the acceptance at any time
by a carrier of less than its published rates. We say this be-
cause we think it obvious that such prohibitions would be ren-
dered wholly ineffective by deciding that a carrier may avoid
those prohibitions by making a contract for the sale of a com-
modity stipulating for the payment of a fixed price in the
future, and thereby acquiring the power during the life of the
contract to continue to execute it, although a violation of the
act to regulate commerce might arise from doing so. Besides,
all the contentions just noticed proceed upon the mistaken
legal conception that the application of the statutory prohibi-
tions depend not upon whether the effect of the acts done is
to violate those prohibitions, but upon whether the carrier in-
tended to violate the statute.

(c) It is urged that if the requirement of the act to regulate commerce as to the maintenance of published rates and the prohibitions of that act against undue preferences and discriminations be applied to a carrier when engaged in buying and selling a commodity which it transports, the substantial effect will be to prohibit the carrier from becoming a dealer when no such prohibition is expressed in the act to regulate commerce,. and hence a prohibition will be implied which should only result from express action by Congress. Granting the premise, the deduction is unfounded. Because no express prohibition against a carrier who engages in interstate commerce becoming a dealer in commodities moving in such commerce is found in the act, it does not follow that the provisions which are expressed in that act should not be applied and be given their lawful effect. Even, therefore, if the result of applying the prohibitions as we have interpreted them will be practically to render it difficult, if not impossible, for a carrier to deal in commodities, this affords no ground for relieving us of the plain duty of enforcing the provisions of the statute as they exist. This conclusion follows, since the power of Congress to subject every carrier engaging in interstate commerce to the regulations which it has adopted is undoubted.

But it is in effect said, conceding this to be true as an original question, the prohibitions of the act ought not now to be interpreted as applying to a carrier who is a dealer in commodities, because of an administrative construction long since given to the act by the Interstate Commerce Commission, the body primarily charged with its enforcement, and which has become a rule of property affecting vast interests which should not be judicially departed from, especially as such construction, it is asserted, has been impliedly sanctioned by Congress by frequently amending the act without changing it in this particular.

Passing, for the present, the legal conclusion, let us first ascertain whether the premise itself is well founded. The two rulings of the Interstate Commerce Commission upon which

the premise is based are *Haddock* v. *Delaware, L. & W. R. Co.,* 4 I. C. C. Rep. 296, 3 Inters. Com. Rep. 302, and *Coxe Bros. & Co.* v. *Lehigh Valley R. R. Co.,* 4 I. C. C. Rep. 535, 3 Inters. Com. Rep. 460, decided respectively in 1890 and 1891.

Without going into detail we content ourselves with saying that in both of the cases complaints were made to the Interstate Commerce Commission concerning the defendant railroads and it was charged that whilst acting as common carriers they were dealing in coal, and as a result violating the prohibitions of the Interstate Commerce Act as to rates and undue preferences and discriminations. It was shown in both cases that the carriers prior to the adoption of the Interstate Commerce Act were authorized by their charters or legislative authority to carry on both the business of mining and selling the coal so mined and transporting the same to market. Indeed it was found in both cases that the functions of producing and transporting, as authorized, were so interblended that it was impossible to separate one from the other. Whilst it is true that in both of the cases it was also shown that the carriers bought, sold and transported some coal which was not produced in the mines which they owned, this fact was evidently treated in view of the other circumstances of the case as of minor importance, since the commingled powers of producing, selling and transporting were alone made the basis of the conclusion reached by the Commission as to the character of relief which could be afforded. Solely in view of the lawful power of the carriers to mine, sell and transport existing before the passage of the act to regulate commerce the Commission decided that its authority, under that statute and under the circumstances of the case, was confined to compelling the exaction of rates which were just and reasonable. The fact that the rulings in the two cases just referred to were solely placed upon the peculiar powers of the defendant corporations possessed by them prior to the passage of the Interstate Commerce Act was pointed out by the Commission in *Grain Rates of Chicago Great Western Ry. Co.,* 7 Inters. Com. Rep. 33. In that case, in de-

ciding that the defendant carrier was without power to purchase grain for the purpose of securing the right to transport it, and thus evade the law which would have applied to its transportation had it been owned by any other party, the Commission, in distinguishing the case before it from the *Haddock* and *Coxe* cases, said (p. 38):

"Those cases are in no respect similar to this. In both the common carrier was also the owner of extensive coal fields, and indeed it had become a common carrier largely for the purpose of transporting the product of those mines to market. This state of things existed before the passage of the act, and had no reference to the act. Unless the carrier was permitted to transport its coal, the result would be in effect the confiscation of its property, and to order it to charge itself with a particular rate would merely result in a matter of bookkeeping. Under these circumstances it was held that the only remedy was to enquire whether the rate charged the complainant was a reasonable one."

Now, without at all intimating that as an original question we would concur in the view expressed in the case last cited: that to have applied the act to regulate commerce, under proper rules and regulations for the segregation of the business of producing, selling and transporting as presented in the *Haddock* and *Coxe* cases, would have been confiscatory, and without reviewing the rulings made by the Interstate Commerce Commission in those cases and adhered to by that body during the many years which have followed those decisions, we concede that the interpretation given by the Commission in those cases to the act to regulate commerce is now binding, and as restricted to the precise conditions which were passed on in the cases referred to, must be applied to all strictly identical cases in the future, at least until Congress has legislated on the subject. We make this concession, because we think we are constrained to so do, in consequence of the familiar rule that a construction made by the body charged with the enforcement of a statute, which construction has long obtained in practical

execution, and has been impliedly sanctioned by the reënact-
ment of the statute without alteration in the particulars con-
strued, when not plainly erroneous, must be treated as read
into the statute.   Especially do we think this rule applicable
to the case in hand, because of the nature and extent of the
authority conferred on the Commission from the beginning
concerning the prohibitions of the act as to rebates, favoritism
and discrimination of all kinds, and particularly in view of
the repeated declarations of the court that an exertion of power
by the Commission concerning such matters was entitled to
great weight and was not lightly to be interfered with.   The
concessions thus made, however, are wholly irrelevant to the
case before us.   This follows, since the Chesapeake and Ohio
was, neither by its charter nor by legislative grant existing at
the time of the adoption of the act to regulate commerce,
possessed of the commingled attributes of carrier and producer,
which was the controlling consideration in the decisions made
in the *Haddock* and *Coxe* cases.

Concluding, therefore, that both the contracts made by the
Chesapeake and Ohio with the New Haven were contrary to
public policy and void because in conflict with the prohibitions
of the act to regulate commerce, it obviously follows that such
contracts were not susceptible of being enforced by the New
Haven, and afforded no legal basis for a claim of the New Haven
against the Chesapeake and Ohio, and therefore the court be-
low was correct in so deciding.

This leaves only for consideration the question raised by the
cross appeal of the Interstate Commerce Commission.   That
proposition is thus stated in the first of the assignments of
error filed on behalf of the Commission:

"That the Circuit Court of the United States for the West-
ern District of Virginia, after finding that the claim of the New
York, New Haven and Hartford Railroad Company against
the Chesapeake and Ohio Railway Company for $103,910.69,
asserted as damages arising from a partial non-performance by
said railway company of a contract of December 3, 1896, set

out in the record, is, as to the whole of said claim and interest thereon, an illegal and unenforceable claim, and after finding that the verbal agreement between said companies, made in April, 1903, and set out in said record, whereby said railway company undertook to furnish to said railroad company 59,966 tons of coal, to be transported from West Virginia to Newport News, Virginia, over the lines of said railway company, and thence transported by vessels to certain New England ports, said coal to be delivered at said ports at the price of $2.75 per ton, New Haven basis, to be an invalid and illegal agreement; that said court merely enjoined and restrained the said Chesapeake and Ohio Railway Company, its officers, agents, and employés from, in any manner, direct or indirect, executing or performing, or attempting to execute or perform, either said contract of December 3, 1896, or said agreement of April, 1903, and from in any manner discharging or satisfying any obligation or seeming obligation arising from said agreements or either of them, or arising from any arrangement or agreement made in lieu of said agreements, or either of them; whereas said court should have further enjoined and restrained the Chesapeake and Ohio Railway Company from giving to said railroad company, or to any other person, firm, or company, any undue or unreasonable advantage or preference, and should further have restrained and enjoined the Chesapeake and Ohio Railway Company from transporting coal from one State to or through any other State for the New York, New Haven and Hartford Railroad Company, or for any firm, person, or company, at a less rate than the duly established freight rate of the said railway company in force at the time, and from further failing to observe its published tariffs, or from giving to the said New York, New Haven and Hartford Railroad Company, or to any person, firm, or company, in any manner whatsoever, any undue or unreasonable preference or advantage, and said decree, entered by the court on the 19th day of February, 1904, in addition to the provisions thereof, should have enjoined and restrained the New York, New Haven and Hart-

ford Railroad Company and its officers and agents from seeking or accepting, in any manner, any direct or indirect rebate of the duly established freight rates of the Chesapeake and Ohio Railway Company on any interstate commerce, and from seeking or accepting in any manner from said railway company any undue or unreasonable preference or advantage."

The contention, therefore, is that whenever a carrier has been adjudged to have violated the act to regulate commerce in any particular it is the duty of the court, not only to enjoin the carrier from further like violations of the act, but to command it in general terms not to violate the act in the future in any particular. - In other words, the proposition is that by the effect of a judgment against a carrier concerning a specific violation of the act, the carrier ceases to be under the protection of the law of the land and must thereafter conduct all its business under the jeopardy of punishment for contempt for violating a general injunction. To state the proposition is, we think, to answer it. *Swift & Company* v. *United States*, 196 U. S. 375. The contention that the cited case is inapposite because it did not concern the act to regulate commerce, but involved a violation of the anti-trust act, we think is also answered by the mere statement of the proposition. The requirement of the act to regulate commerce that a court shall enforce an observance of the statute against a carrier who has been adjudged to have violated its provisions, in no way gives countenance to the assumption that Congress intended that a court should issue an injunction of such a general character as would be violative of the most elementary principles of justice. The injunction which was granted in the case of *In re Debs*, 158 U. S. 564, was not open to such an objection, as its terms were no broader than the conspiracy which it was the purpose of the proceeding to restrain. To accede to the doctrine relied upon would compel us, under the guise of protecting freedom of commerce, to announce a rule which would be destructive of the fundamental liberties of the citizen.

As the court below did not decide that the second and sixth

sections of the act, relating to the maintenance of rates, had been violated, the injunction, by it issued, was not made as directly responsive to the commands of the statute on that subject as we think it should have been. We, therefore, conclude that the injunction below should be modified and enlarged by perpetually enjoining the Chesapeake and Ohio from taking less than the rates fixed in its published tariff of freight rates, by means of dealing in the purchase and sale of coal. And, as thus modified, the decree below is

*Affirmed.*