The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, a corporation, Appellant,

v.

Sol BOUZIDEN, Albert Bouziden and Pete Leslie, individuals, Sol Bouziden and Albert Bouziden, d/b/a B & B Cattle Co., and B & B Cattle Co., Appellees.

No. 6948.

United States Court of Appeals Tenth Circuit.

July 12, 1962.

Rehearing Denied Aug. 6, 1962.

Alfred P. Murrah, Jr., Oklahoma City, Okl. (Rainey, Flynn & Welch, Oklahoma City, Okl., of counsel), for appellant.

John W. Swinford, Oklahoma City, Okl. (Frank Houts, Alva, Okl., on the brief; Crowe, Boxley, Dunlevy, Thweatt, Swinford & Johnson, Oklahoma City, Okl., of counsel), for appellees.

Before PHILLIPS, PICKETT and LEWIS, Circuit Judges.

PHILLIPS, Circuit Judge.

The Atchison, Topeka and Santa Fe Railway Company, hereinafter called the Santa Fe, instituted this action against the above-named appellees, hereinafter referred to as the shippers, to recover alleged freight undercharges in the amount of $1,560.01, alleged to be due on shipments of cattle.

The case was tried to the court. The record here consists of the pleadings, the Santa Fe's motion for summary judgment and certain exhibits attached thereto, the court's findings of fact and conclusions of law and the judgment.

The facts, as reflected by the findings, are these:

On February 25 and 27, 1959, the shippers entered into uniform livestock contracts for the shipment of 40 cars of feeder cattle from Hereford, Arizona to Eskridge, Kansas. The shippers in such uniform contracts designated that the route should be over the Southern Pacific Railway Company from Hereford to Tucumcari, New Mexico, over the Chicago-Rock Island and Pacific Railway Company, hereinafter called the Rock Island, from Tucumcari to Alma, Kansas, and over the Santa Fe from Alma to Eskridge. The uniform contracts further provided that the cattle were to be stopped in transit at Tucumcari for rest, feed and water.

During all times here material, there was in force and effect a written contract between Don Fleming and the Rock Island, whereby Fleming undertook to rest, feed and water cattle in his stockyards, when their shipment was stopped in transit for those purposes at Tucumcari.

When the cattle of the shippers arrived at Tucumcari, they were delivered to the Rock Island, which in turn delivered them to Fleming for rest, feed and water.

After the cattle arrived at Tucumcari, the Santa Fe advised the shippers that if the cattle were shipped on from Alma to Eskridge, the lawful rate would be a combination rate, which was in excess of the through rate.

When the shippers learned that the combination rate would apply if the cattle were shipped on from Alma to Eskridge, acting through Sol Bouziden, they

orally requested Fleming to divert the shipment by stopping it at Alma.

At all times herein material, there was on file with the Interstate Commerce Commission a published tariff of the Rock Island, which required that any diversion request be made in writing or confirmed in writing. The shippers did not make in writing nor confirm in writing a request to the Rock Island to divert the cattle to Alma. Sol Bouziden had been in the business of buying and selling feeder cattle for more than 20 years in large quantities. During that period he had been shipping cattle over the same route and by the same connecting carriers designated in the uniform contracts and had had occasion from time to time to divert shipments of cattle after they had been stopped at Tucumcari for rest, feed and water. Because the person in charge of the cattle while they were stopped in transit at Tucumcari was the only one who could identify particular cattle, it had been his uniform practice to orally request such person, rather than the carrier's agent at Tucumcari, to make such diversions and prior to the shipment here in question his requested diversions had been made.

After making the verbal diversion request to Fleming, the shippers made arrangements with a trucking company to receive the cattle at Alma and transport them to pastures. However, before the trucks arrived at Alma, the cattle were transferred by the Rock Island to the Santa Fe at Alma and were en route to Eskridge. The cattle were delivered to the shippers at Eskridge. Freight bills were delivered to the shippers, with the freight computed on the combination rate, it being the lawful rate, from Hereford to Eskridge. Upon receipt of the freight bills, the shippers advised the General Livestock Agent for the Santa Fe that they declined to pay the freight charges for the reason that the Santa Fe and its connecting carrier had failed to honor the shippers' request to divert the shipment from Eskridge to Alma. The Santa Fe took the position that the shippers owed freight charges computed on the combination rates. The shippers and the Santa Fe finally agreed to a compromise, made in good faith, under which the shippers paid freight charges on the basis of the lesser through rate from Hereford to Eskridge.

In his conclusions of law, the trial court said:

" * * * The fact that the shipment could not go forward without orders from the defendants and the fact that simultaneous with the giving of these orders, the Rock Island Railway was instructed to ship to Alma, Kansas presents a difficult legal question as to whether the Rock Island could accept a part of the shipper's instructions to reload and ship the cattle and ignore the balance of these instructions to ship to Alma, Kansas, merely because these instructions were not in writing as required by the schedules on file. Even if it is assumed as a matter of law that a carrier cannot waive the requirement that a diversion request be made in writing or confirmed in writing it does not follow that the carrier may accept a part of the shipper's instructions and reject the rest, since the defendants undoubtedly gave the orders to continue the shipment conditional upon the railroad recognizing the request for diversion to Alma, Kansas. * * *."

The trial court concluded that the compromise agreement was binding and entered judgment for the shippers. The Santa Fe has appealed.

The feeding contract between the Rock Island and Fleming contained no provision authorizing Fleming to receive shipping orders or diversion requests from shippers, as agent for the Rock Island.

In his conclusions of law, the trial court stated that under the evidence it could not be determined whether Fleming had "implied authority" to accept diversion requests in behalf of the Rock Island, or "whether in doing so he represented the carrier or the shipper," but the fact that the shippers and other cattlemen "had customarily dealt with

him in matters of this kind is indicative * * * that he possessed some authority or ostensible authority to accept these requests."

The trial court did not find that Fleming requested the Rock Island to divert the cattle shipments from Eskridge to Alma.

Fleming, in an affidavit attached as an exhibit to the motion for summary judgment, stated that it was customary for him to receive instructions from shippers to divert the shipment of cattle; that the Rock Island did not instruct him or authorize him to receive such requests for it, and that in receiving such requests he acted solely for the benefit of the shippers; and that with respect to the shipments here involved, he did not recall having received any instructions to divert such shipments. B. D. Kersey, the Station Agent of the Rock Island at Tucumcari, in an affidavit attached to such motion stated that Fleming frequently relayed diversion requests of shippers to him, but that he did not do so with respect to the shipments here involved and that he never authorized Fleming to receive diversion requests on behalf of the Rock Island.

The trial court apparently proceeded on the theory that the order to ship cattle and to divert them to Alma, made by the shippers to Fleming, was made to Fleming, as ostensible agent of the Rock Island and that the contention of the shippers that the Rock Island could not accept a verbal order to ship the cattle on from Tucumcari and reject a verbal order made at the same time to divert them to Alma created a good faith controversy between the parties, which they could lawfully compromise.

The party who relies on agency has the budren of proving it.[1] Agency cannot be established by acts or declarations of the alleged agent.[2]

On the basis of the statement of the trial court in his conclusions of law, that under the evidence it could not be determined whether Fleming had "implied authority" to accept diversion requests in behalf of the Rock Island, it must be held that the shippers failed to establish such "implied authority" on the part of Fleming. And, we are of the opinion that the facts found by the trial court with respect to the practice of Sol Bouziden and other cattle shippers to give verbal requests to the persons in charge of feeding, watering and resting cattle in transit were insufficient to establish that Fleming was the agent of the Rock Island to receive diversion requests. Such facts were just as consistent with the conclusion that Fleming in such instances acted as the agent of the shipper in communicating such requests to the Rock Island Agent at Tucumcari. Moreover, the Rock Island could not authorize Fleming to accept a verbal diversion request and waive the tariff requirement that such a request be made in writing or confirmed in writing. Indeed, the Rock Island itself could not waive such requirement.[3] We conclude that the oral diversion request given by the shippers to Fleming was not made to him as agent of the Rock Island.

However, we shall assume that Fleming directed the agent at Tucumcari to proceed with the shipment and at the same time orally requested him to divert the shipment to Alma.

1. Gillentine v. Illinois Wesleyan University, 5 Cir., 194 F.2d 970, 973; Adams v. Barron G. Collier, Inc., 8 Cir., 73 F.2d 975, 978; Collins v. Streitz, 9 Cir., 95 F. 2d 430, 436, c. d. 305 U.S. 608; Steinbrugge v. Haddock, 10 Cir., 281 F.2d 871, 872.

2. Bronx Fire Ins. Co. v. Wasson, 10 Cir., 62 F.2d 556, 558; Atex Manufacturing Company v. "Lloyd's of London," D.C. Ark., 139 F.Supp. 314, 318; 3 C.J.S. Agency § 322(c) and (e), pp. 276, 281-282.

3. Atchison, T. & S. F. Ry. Co. v. Springer, 7 Cir., 172 F.2d 346, 349, 350; Davis v. Henderson, 266 U.S. 92, 93, 45 S.Ct. 24, 69 L.Ed. 182.

A tariff, so long as it remains in effect, binds both carriers and shippers with the force of law.[4]

Both the shippers and the carriers were conclusively presumed to know that the tariff provision referred to above required diversion orders to be made in writing or confirmed in writing.[5] Here, no diversion order was made in writing or confirmed in writing.

49 U.S.C.A. § 6, par. (7) provides:

"No carrier, unless otherwise provided by this chapter, shall engage or participate in the transportation of passengers or property, as defined in this chapter, unless the rates, fares, and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of this chapter; nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property, or for any service in connection therewith, between the points named in such tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time; nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares, and charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property, except such as are specified in such tariffs."

The salutary purpose of the statute is to secure uniform treatment of shippers and to shut out opportunity for discrimination and favoritism.[6]

In Empire Petroleum Co. v. Sinclair Pipeline Co., 10 Cir., 282 F.2d 913, 916, this court said:

"* * * The compulsion of the Interstate Commerce Act is such that the intricacies of private contract cannot be permitted to result in rate discrimination, actual or potential. This rule is necessary to prevent collusionary discrimination between shipper and carrier and results in the consignee being liable for transportation costs as a matter of law upon his acceptance of the goods from the carrier and regardless of any consignor-consignee contract to the contrary. * * *"

And in Bernstein Bros. Pipe & Mach. Co. v. Denver & R. G. W. R. Co., 10 Cir., 193 F.2d 441, 444, we said:

"* * * No contract of the carrier can reduce the amount legally payable or release from liability, a shipper who has assumed an obligation to pay the charges. Nor will any act or omission of the carrier estop or preclude it from enforcing payment of the full amount under the tariff by a person liable therefor. If less than the established and published applicable rate is collected, the carrier has the duty and the right to collect the amount of the undercharge. * * *"[7]

The shippers concede that they did not give a diversion request in writing, or confirm such a request in writing, and that a verbal request, which we have assumed was given, was not lawful and was not binding on the Rock Island.

4. Lowden v. Simonds Etc. Grain Co., 306 U.S. 516, 520, 59 S.Ct. 612, 83 L.Ed. 953, rehearing denied, 307 U.S. 649, 59 S.Ct. 792, 83 L.Ed. 1528; Penna. R. R. Co. v. International Coal Co., 230 U.S. 184, 196, 33 S.Ct. 893, 57 L.Ed. 1446.

5. Atchison, T. & S. F. Ry. Co. v. Springer, 7 Cir., 172 F.2d 346, 349; F. Burkhart Mfg. Co. v. Fort Worth & D. C. Ry. Co., 8 Cir., 149 F.2d 909, 910.

6. Louisville & N. R. Co. v. Dickerson, 6 Cir., 191 F. 705, 709; Atchison, T. & S. F. Ry. Co. v. Springer, 7 Cir., 172 F.2d 346, 349; F. Burkhart Mfg. Co. v. Fort Worth & D. C. Ry. Co., 8 Cir., 149 F.2d 909, 910; New York, New Haven R. R. v. Interstate Com. Comm., 200 U.S. 361, 391, 26 S.Ct. 272, 50 L.Ed. 515.

7. See, also, Louisville & Nashville R. R. v. Central Iron Co., 265 U.S. 59, 65, 44 S. Ct. 441, 68 L.Ed. 900.

They assert, however, that the Rock Island could not accept a direction to ship and at the same time ignore an oral request coupled therewith to divert the shipment. The effect of their contention is that they could avoid the requirement that a diversion request be in writing or confirmed in writing by coupling an oral request with a direction to ship. In other words, the effect of their contention is that the Rock Island by shipping the cattle impliedly agreed to accept an oral diversion request and to waive the requirement that it be in writing. To accord validity to the shippers' contention would open the door to a device to avoid the requirement that a diversion order be made in writing or confirmed in writing, a requirement which had the force and effect of law, and defeat the purpose of the statute (49 U.S.C.A. § 6, par. (7), supra).

We have no doubt that if a shipper went to a carrier and directed it to ship goods then in the custody of the carrier to a stated destination, on the condition that the carrier would charge less than the lawful rate, and the carrier proceeded to ship the goods, the implied agreement of the carrier to accept the condition would be void and would not preclude the carrier from collecting the lawful rate. To hold otherwise would open wide the door to unlawful discrimination. We see no distinction in principle between the example we have given and the asserted factual and legal basis upon which the shippers base their contention in the instant case.

 Moreover, it is well settled that no act or omission of the carrier will estop or preclude it from enforcing payment of the amount due under a lawful tariff.[8] Hence, the Rock Island could neither estop nor preclude, by implied agreement or otherwise, the right and duty of the Santa Fe to collect the freight charge on the basis of the combination rate by its action in accepting

a shipping order coupled with an unlawful diversion request.

 Accordingly, we conclude that the compromise agreement was unlawful and not binding on the carrier.

The judgment is reversed and the cause remanded, with instructions to enter judgment for the Santa Fe for the difference between the through rate and the combined rate.

8. Bernstein Bros. Pipe & Mach. Co. v. Denver & R. G. W. R. Co., 10 Cir., 193 F.2d 441, 444; Louisville & Nashville R. R. v.

Central Iron Co., 265 U.S. 59, 65; Empire Petroleum Co. v. Sinclair Pipeline Co., 10 Cir., 282 F.2d 913, 916.