The KANSAS POWER AND LIGHT COMPANY, Plaintiff,

and

Kansas Corporation Commission, Intervenor-Plaintiff,

v.

BURLINGTON NORTHERN RAILROAD CO., Defendant.

Civ. A. No. 82–4018.

United States District Court, D. Kansas.

Aug. 19, 1982.

John K. Rosenberg, David S. Black, Topeka, Kan., John M. Cleary, Frederic L. Wood, Donelan, Cleary, Wood & Maser, Washington, D. C., for plaintiff.

Dennis D. Ahlers, Asst. Gen. Counsel, Kansas Corp. Com'n, Topeka, Kan., for intervenor-plaintiff.

Betty Jo Christian, Loren Kieve, Steptoe & Johnson, Chtd., Washington, D. C., Edward Mullen, Thomas E. Deacy, Deacy & Deacy, Kansas City, Mo., Donald Patterson, Fisher, Patterson, Sayler & Smith, Topeka, Kan., Donald E. Engle, St. Paul, Minn., for defendant.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This is an action for declaratory judgment and for a permanent injunction to prevent defendant Burlington Northern Railroad Company [hereinafter BN] from

breaching an agreement or violating a promise to Kansas Power and Light Company [hereinafter KPL] by putting into effect rates and charges for the transportation of coal from Belle Ayr, Wyoming, to KPL's generating station at Jeffrey, Kansas, which rates would be higher than the rates and charges to which defendant agreed and promised to keep in effect.

In sum and substance, plaintiff seeks an order from this court finding that a contract existed between the parties for transportation of coal in unit trains from Wyoming to Kansas, and that defendant's recently-approved seventy-five cents (75¢) per ton rate increase is a breach of that contract.

Plaintiff contends that a rate of Eight and 28/100 Dollars ($8.28) per ton was the rate jointly agreed to by the parties for the movement of coal from Belle Ayr, Wyoming, to Kansas. Plaintiff contends that the agreement between the parties provided for an increase in this rate according to an escalation formula. BN, however, has made known its intention to raise the rate substantially higher than that called for in the purported agreement between the parties, and substantially higher than allowed for by the escalation formula.

On February 5, 1982, this court issued a temporary restraining order restraining BN from increasing the rate above that contained in the purported agreement between the parties, as escalated. On February 12, 1982, this court issued a similar preliminary injunction on the basis of a finding that there was a substantial likelihood that plaintiff would prevail on the merits, that irreparable harm would occur if the order were not entered, that the balance of hardship was in plaintiff's favor, and that the public interest favored the granting of such an injunction. On March 12, 1982, the court allowed the Kansas Corporation Commission to intervene in this lawsuit, they appeared by counsel at the trial on the merits, and have briefed the issues before the court. The trial of this case was held from May 17 through May 21, 1982, and concluded on June 1, 1982. The court has taken the matter under advisement and is now prepared to rule. Pursuant to Rule 52(a), Federal Rules of Civil Procedure, the court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Plaintiff KPL is incorporated under the laws of Kansas, and has its principal place of business in Topeka, Kansas.

2. Defendant BN is incorporated under the laws of Delaware, and has its principal place of business in St. Paul, Minnesota.

3. KPL is a privately-owned electric company. By the late 1960s, KPL had decided to establish new electricity generating facilities within its service area.

4. KPL decided on coal as the fuel for its new generating plants, after ruling out other types of fuel such as natural gas and nuclear energy.

5. By the early 1970s, KPL undertook to find a location for its new generating facility, to plan for a new coal supply, to arrange for the transportation of the coal required, and to arrange for the construction of boilers for the new generating plant whose specifications had to be finally determined by the particular type of coal selected.

6. In mid-1971, it became apparent that some of the possible sites for the new plant and its coal supply would be served by BN, and others by the Union Pacific Railroad and other carriers.

7. During the latter half of 1971, both the Union Pacific Railroad and BN supplied KPL with tentative estimates of unit train rates from a number of possible coal producing areas in the west to several possible plant locations in Kansas.

8. Several meetings were held by KPL with these railroads.

9. Daric Miller was the KPL employee who was primarily responsible for the initial planning of the new power plant. At a meeting in Topeka at KPL headquarters on September 20, 1971, Mr. Miller asked BN to provide estimates for unit train rates for the transportation of coal from Powder River Basin, Wyoming, to several prospective power plant sites.

BN responded to Mr. Miller's request by letter dated October 7, 1971, in which rates were quoted from Gillette, Wyoming, to four prospective locations in Kansas, and additional rates for other possible locations along the Kansas river.

10. On November 11, 1971, BN and KPL representatives met to discuss several possible plant locations, preliminary rate estimates and a proposed escalation formula. Specifically, Mr. Miller asked BN to quote rates for three locations and to contact the Union Pacific Railroad regarding a joint movement of coal from Wyoming to Topeka, Kansas.

11. In response, on January 19, 1972, BN sent a letter to KPL setting forth rates from Gillette, Wyoming, and Decker, Montana, to three sites in Kansas. BN indicated that the rate quotations would be subject to a rate escalation. The formula was set out in detail and was declared to be subject to the concurrence of a connecting line carrier for a joint movement. The letter also included a "formula intent" clause, which stated that the escalation formula would compensate the railroad for increases in the cost of transporting coal above a stated base-cost level, except for "gross inequities," which had to be resolved by the mutual agreement of the parties.

12. The letter of January 19, 1972, stated:

"The rates quoted above are tendered with a time limit of six months from the date of this letter."

KPL took no action in reliance on, and BN received no response to, the letter of January 19th within the six-month period.

13. The letter of January 19, 1972, also stated:

"This proposal is contingent upon the utility entering into a long-term contract of twenty or more years with coal producers on BN for the indicated coal requirements."

14. KPL, however, was seeking a fifty-year initial commitment from a coal supplier. KPL has not made any claim, nor has it offered any evidence, that in obtaining its forty-year coal supply contract, it acted as a result of the twenty-year language contained in the January 19, 1972, letter.

15. By April 3, 1972, KPL had tentatively rejected coal from the Hanna Basin because it was too costly and did not contain sufficient supplies of easily-mined coal.

16. By a memo to the file, dated July 5, 1972, Mr. Jeffrey, the Chief Executive Officer of KPL, had decided to proceed with negotiations with suppliers from the Powder River Basin. Further, in the same memo, Mr. Jeffrey indicated that he had decided that the site near Delia, Kansas, "had the best prospects" and that, in his opinion, KPL should proceed with planning the location of the new electric generating plant at that site.

17. By September 1, 1972, KPL had agreed to commit itself to the purchase of two hundred million tons of coal from the AMAX Coal Company, subject only to a mutually-satisfactory long-term agreement between the parties, and approval of the president and board of directors of KPL.

18. By August 23, 1972, KPL had obtained approval from its board of directors to enter into the AMAX Coal Supply contract.

19. Meanwhile, negotiations with BN continued during the spring of 1972. In March, 1972, BN represented to KPL personnel that one of the advantages of increasing the rate by means of an escalation formula was that the BN formula would produce rates over a specified six-year period that were lower than those produced by the process of seeking separate *ex parte* increases from the Interstate Commerce Commission.

20. In August, 1972, KPL was informed by BN that BN's escalation formula proposal was firm only for single-line movements, and that BN could not guarantee Union Pacific's agreement to the escalation clause for a joint-line movement.

21. In August, 1972, BN proposed for the first time a "volume incentive rate" to KPL on its proposed rate. The volume incentive would allow the rate to be reduced as KPL placed additional coal-fired

power plants into operation and shipped additional coal.

22. On November 17, 1972, representatives of BN and KPL had a meeting. At the meeting, Mr. Miller requested rate quotations from BN by the first of December for two destinations, a site near Delia, Kansas, and a site near Leavenworth, Kansas. At the same meeting, Mr. Miller informed BN that KPL had committed itself to purchase two million tons of coal per year from AMAX Coal Company beginning in 1978. This commitment had been made effective September 1, 1972. Mr. Miller also informed BN that KPL intended eventually to bring on line four coal-fired power plants over a period of time, and expected coal deliveries from AMAX to eventually reach seven and one-half million tons of coal per year by 1983.

23. In response to Mr. Miller's request for a rate, BN prepared two letters dated November 30, 1972, which were delivered to KPL in Topeka on December 1, 1972.

24. One letter contained proposed rates covering the transportation of coal by unit train from Belle Ayr, Wyoming, to Leavenworth, Kansas, on the Burlington Northern and Missouri Pacific railroad lines.

25. The other letter, which plaintiff now argues is a binding contract between the parties, contained proposed rates for the transportation of coal by unit train from Belle Ayr, Wyoming, to a site near Delia, Kansas, on the lines of the Burlington Northern and Union Pacific railroads.

26. The November 30 letter, referring to the joint BN-Union Pacific movement, stated that it was "an outline of the intent and understanding" of BN and Union Pacific regarding the movement of coal from Belle Ayr, Wyoming, to Kansas. The rates quoted in the letter were described as "proposed rates" for carrier and shipper cars.

27. The escalation formula contained in the letter was designed as a substitute for *ex parte* increases, a procedure which was at the time in general use in the railroad industry as a means of making rate adjustments.

28. A proposed tariff was not attached to the letter of November 30, 1972. The parties had not discussed, nor had they agreed to, the details which would be contained in a tariff that would be acceptable to the Interstate Commerce Commission [hereinafter ICC].

29. BN intended the letter of November 30, 1972, to state the current position of the parties and to serve as the basis for continuing discussions and negotiations regarding the items to be put into the tariff that was to govern the movement of coal from Wyoming to Kansas.

30. KPL asserts that a formal public announcement on March 6, 1973, of the construction of its new power plant near Delia, Kansas, constituted acceptance of an alleged offer contained in the November 30 letter. At the announcement on March 6, Mr. Jeffrey, the President, Chairman of the Board and Chief Executive Officer of KPL, made public the company's decision to construct four coal-fired generating power plants. The court finds that Mr. Jeffrey did not intend his March 6, 1973, speech to be an acceptance of an alleged offer made in the November 30 letter.

31. The court finds that BN did not intend or treat the correspondence and discussions with KPL as constituting an offer leading to a contract between BN and KPL.

32. The court finds that the parties understood that under the regulatory scheme of the Interstate Commerce Act prior to 1978, carriers and shippers could not enter into binding contracts for rates for the transportation of coal.

33. The court finds that no officer or employee of KPL recognized or treated the November 30, 1972 letter, or prior discussions with BN, as constituting an offer by BN or as constituting a contract between BN and KPL prior to the present lawsuit.

34. The court finds that all parties understood that the transportation of coal was governed by an ICC tariff rather than a contract, and that a tariff contained all the legal obligations of the carrier to the shipper in regard to the transportation of coal.

1342

35. KPL did not believe the November 30, 1972, letter and the March 6, 1973, speech to the public by KPL President Jeffrey combined together to produce a contract, because KPL did not treat this alleged contract the same way as it treated other major long-term contracts that were the subject of testimony at the trial. In particular, KPL officers were required to submit contracts worth a half million dollars or more to the board of directors for approval, but KPL never submitted this alleged contract with BN to the board of directors for approval. This is in contrast to KPL's handling of the AMAX coal supply contract, which was submitted to the board for their approval.

There is no evidence that KPL had ever entered into a long-term contract with any other party on the basis of an offer made in a letter and a speech constituting acceptance of the offer thirteen months later. For example, the AMAX Coal Company contract is embodied in the thirty-four page document, subject to many revisions, reviewed by outside counsel, executed by the presidents of both companies, notarized and filed with the secretary of the corporation. The alleged contract between BN and KPL had never been submitted to KPL's outside attorney for approval, as had the AMAX coal supply contract.

Furthermore, the annual reports of KPL for 1973 and again for 1974 state that KPL has a long-term contract with the AMAX Coal Company, but makes no reference to a contract with BN for the transportation of coal for an equally long term.

36. In a speech delivered at the Salomon Brothers Railroad Industry Symposium on June 8, 1977, Mr. Wall, Mr. Jeffrey's successor as President of KPL, discussed at length his company's relationship with the Burlington Northern Railroad, but made no mention of a contract between BN and KPL for the movement of coal.

37. KPL did not communicate with BN regarding either of the letters of November 30, 1972, until more than three years later, in December, 1975.

38. On December 16, 1975, Mr. Miller, on behalf of KPL, referring to the letter of November 30, 1972, stated, "as you are aware, we accepted the conditions of this letter and are in the process of constructing the Jeffrey Energy Center...." The December 16th letter also directed BN to prepare a proposed tariff for review of the parties.

39. The December 16, 1975, letter was the first communication from KPL regarding the letter of November 30, 1972.

40. However, by that time BN was aware that the rates proposed and the volume incentive proposal set forth in the November 30, 1972, letter were no longer feasible.

41. For example, on August 25, 1975, BN, by and through Mr. Sandgren, prepared a draft letter of understanding in regard to the movement of coal from Belle Ayr, Wyoming, to Jeffrey, Kansas. This draft letter had attached to it a proposed tariff. This letter varied in significant detail from the November 30, 1972, letter. For example, the tonnage incentive was completely eliminated, and the rates quoted were said to apply to only one of the four units planned at the Jeffrey Energy Center. A new freight rate was intended to be negotiated for moving coal to additional units.

42. Likewise, on January 13, 1976, Mr. Sandgren drafted another letter of understanding and sent it to the Union Pacific Railroad, with the intent that Union Pacific relay the letter to KPL. This draft letter of understanding was accompanied by an attached tariff covering the transportation of coal by unit train from Belle Ayr, Wyoming, to Jeffrey, Kansas.

43. The January 13th letter varied from the November 30, 1972, letter in that, like the letter drafted in August, 1975, the volume tonnage incentive was completely eliminated, and the rates applied only to the first unit of the Jeffrey Energy Center. This proposal provided for further negotiations on terms for moving coal to the additional units.

44. On September 25, 1976, representatives from Union Pacific, BN and KPL met. KPL was informed of BN and Union Pacif-

ic's desire to fix increased rates for the movement of coal to the Jeffrey Energy Center. KPL, through Mr. Miller, its agent, did not agree to increased rates, and requested a letter of explanation. At this meeting, KPL did not claim that the increased rates would constitute a breach of contract.

45. At the same meeting, Mr. Miller raised the possibility that KPL's coal requirements might be supplied by means of a coal slurry pipeline. There was apparently no discussion at that meeting that this form of transportation for the coal movement would constitute a breach of the alleged contract between KPL and BN.

46. At the same meeting, Mr. Miller, on behalf of KPL, indicated for the first time that KPL did not wish to furnish the railroad cars for the proposed movement of coal. This was contrary to the statement in the letter of November 30, 1972, to the effect that KPL would be responsible for providing all railroad cars.

That part of the November 30, 1972, letter stated:

> "It is understood that KPL will provide swivel coupler cars, rent free to BN and UP, to ship between 2,000,000 and 7,500,-000 tons of coal per year."

Apparently, despite this language, KPL did not feel that their decision not to furnish railroad cars would constitute a breach of contract.

47. KPL and Union Pacific worked out an arrangement independent of BN for the lease of cars by Union Pacific to KPL for the movement of coal to the Jeffrey Energy Center. On February 8, 1977, Union Pacific submitted a proposal to KPL to furnish these cars for a separate rental charge on a year-to-year basis.

48. Because of the agreement between KPL and Union Pacific to lease cars, Union Pacific took the position that a change in the proposed interchange point from Hastings to Northport was necessary so that Union Pacific could service the cars at its car maintenance facility near Northport, Nebraska.

49. Changing the interchange point from Hastings to Northport would require the trains to take a different route. This different route would result in a reduction of two hundred and forty miles, or nearly forty percent, in the distance the coal was to be transported by BN under the terms of the letter of November 30, 1972.

50. Because of the impact of this proposed change on the coal movement, and perhaps for other reasons, BN management was unwilling to concur in the change of interchange points. The parties could not reach an agreement about the interchange point until June of 1977, even though the movement of coal was to begin that month.

51. On June 10, 1977, the parties arrived at an agreement as to the interchange point in order that a tariff could be filed with the ICC to allow the movement of coal to begin.

52. On June 29, 1977, Union Pacific forwarded to BN another draft letter of understanding of all the parties which differed significantly from the letter of November 30, 1972. This letter contained changes in the proposed incentive rate, as well as memorialized the parties' agreement to the change in the interchange point and car supply arrangement. There is no mention in this letter of a previously-existing contract between the parties. There is no recognition in this letter of the fact that these proposed changes would alter an existing contract between the parties.

53. A freight tariff was ultimately filed for unit train rates for the transportation of coal from Belle Ayr, Wyoming, to Jeffrey, Kansas, effective August 10, 1977. The structure of this tariff, and the rates proposed, differ significantly from what was set forth in the letter of understanding dated November 30, 1972.

54. The 1977 and subsequent tariffs differ significantly from the letter of November 30, 1972, in that:

(1) the letter states that the movement will be routed through Hastings, Nebraska, while the tariff states that the movement will be routed through Northport, Nebraska;

1344

(2) the letter of understanding of November 30, 1972, stated that it was understood that KPL would provide swivel coupler cars, while the tariff contains a charge for the cars to be provided by the Union Pacific Railroad to KPL;

(3) the letter contains a tonnage incentive rate, which is not included in the 1977 tariff;

(4) the letter of November 30 mentions only Belle Ayr, Wyoming, as a point of origin, while the tariff issued in 1978, and subsequent tariffs, have Eagle Junction, Wyoming, as a point of origin; and

(5) even though the parties' understanding was that the shipper would provide the cars, the letter of November 30 quotes a carrier car rate and an escalation formula; the price actually stated in the tariffs for the transportation of coal with cars supplied by one of the carriers, is different from the carrier car rate quoted in that letter.

56. In early 1981, BN informed KPL that BN planned to raise its rates for the transportation of coal to the Jeffrey Energy Center.

57. On February 6, 1981, Mr. William E. Wall, President and Chief Executive Officer of KPL, issued a press release directed to the Kansas Congressional Delegation. In the press release, Mr. Wall, on behalf of KPL, objected to BN's proposed increase in freight rates. In that press release, KPL did not assert that there was a contract for freight rates between BN and KPL, or that BN would be in breach of contract if the rates were increased.

58. On February 16, 1981, Mr. Wall, on behalf of KPL, sent a mailgram to Mr. Bressler, President and Chief Executive Officer of the Burlington Northern Railroad. In this mailgram, Mr. Wall criticized BN for its decision to raise freight rates. Mr. Wall called the proposed freight rate a "shockingly high freight increase," and referred to BN's "continuing efforts to keep a stranglehold on coal shipments from the Powder River Basin by blocking coal slurry lines or competition from other railroads." Mr. Wall referred to BN's increase as "stunning in its magnitude." Mr. Wall, however, did not assert that BN would be in breach of contract were the rates increased.

59. On July 31, 1981, representatives of BN met with representatives of KPL, including KPL's general counsel, to discuss the rate increase sought by BN. At that meeting, there apparently was no reference by any KPL representative to a contract between KPL and BN for the transportation of coal to the Jeffrey Energy Center.

60. In August, 1981, BN told KPL that, while Union Pacific did not want to join in any rate increase, BN wanted to increase the freight rate on coal by approximately One and 34/100 Dollars ($1.34) per ton.

61. On October 1, 1981, BN filed a tariff with the ICC to publish a surcharge of thirty-seven cents (37¢) per ton on the BN portion of the KPL rate. The ICC rejected this.

62. On December 19, 1981, BN filed a tariff supplement in which BN proposed to increase the rate for its portion of the haul to Jeffrey, Kansas, by seventy-five cents (75¢) per ton.

63. KPL objected to the increase, but the ICC permitted the supplement to become effective.

64. KPL filed the present lawsuit, and moved for a temporary restraining order and preliminary injunction to prevent the rate from becoming effective. Both motions have been granted by this court, subject to a bond by KPL.

CONCLUSIONS OF LAW

■ After consideration of all the evidence and testimony, the court concludes that there was no contract between the parties and that plaintiff is not entitled to relief on the theory of promissory estoppel. The court finds that there was not at any time a contract for rates, or a contract to file a tariff, and that even if there had been such a contract, it must fail as a matter of law because it is not in conformance with the statute of frauds, is indefinite in dura-

tion, and does not contain the requisite mutuality of obligation.

■ Plaintiff's claim for an express contract is based on a purported offer made by BN on November 30, 1972. It is the contention of KPL that this "offer" was accepted in either of two ways: (1) by the performance called for in the contract, that is, completing a long-term coal contract with AMAX and building a power plant at a site served by the Union Pacific Railroad; or (2) by an express acceptance and counter-promise in the form of a public statement by Balfour Jeffrey, President and Chief Executive Officer of KPL, at the dedication of the Jeffrey Energy Center. The court concludes, however, that at all relevant times, both parties knew that such a contract was illegal *per se*, and unenforceable; therefore, neither party intended to enter into a contract, as that term is defined in the law, and neither party intended to be bound by their representations.

BN presented uncontradicted testimony about the conduct in general of shippers and carriers in their business dealings before the ICC prior to 1978, and the court is familiar with the state of the law at that time. From the late 19th Century, until the enactment of the Staggers Rail Act in October, 1980, railroad rates were subject to regulation by the ICC. Railroads could charge only rates contained in a tariff on file with and approved by the ICC setting out each and every term and condition of the transportation movement. The ICC had the power and authority to determine the reasonableness of any rate, and to prevent the implementation of proposed rate changes by suspending them and investigating their reasonableness. An absolutely essential component of this comprehensive regulatory scheme was the notion that private contracts between a shipper and a carrier with respect to rates were illegal *per se* and forbidden by law.

According to BN's uncontradicted testimony, this regulatory scheme did not mean that shippers and carriers were precluded from any negotiations as to rates of transportation. The testimony before the court was to the effect that because any new, large-scale movement of traffic was likely to require the publication of a new rate, negotiations between shippers and carriers was common. All negotiations between shippers and carriers, however, took place with full awareness of the regulatory scheme in which they operated, and with full awareness of the limits set by the law.

The normal practice was for the shipper to advise the railroad of an anticipated transportation need and to ask the railroad to quote a rate for that movement. After considering all relevant factors, the railroad would give the shipper an estimate of what the rate was likely to be. In cases of long-term movements, the shipper might also seek to determine from the railroad what mechanism the railroad anticipated using for future rate increases. In many cases, the railroad would propose an escalation formula. Whether or not the shipper and carrier reached an understanding with respect to the rate to be filed, a tariff was filed with the ICC, and the shipper was free to challenge the rate by means of a protest. In all cases, the railroad was free to file any rate that it chose, subject to the shippers' right to file a protest and the ICC's power, in every case, to investigate the proposed rate and to determine its reasonableness.

Legally enforceable contracts for transportation between shippers and railroads with respect to rates were not possible until 1978. In 1978, the ICC issued a policy statement announcing that, for the first time, future contract rates would not be regarded as illegal *per se*. The ICC proposed a mechanism by which contract rate tariffs could be filed with the ICC, subject to its power to determine their reasonableness. The ICC's change of heart in regard to the enforcement of rate contracts came in the wake of several highly-publicized railroad bankruptcies, and the first of the railroad deregulation statutes. *E.g.*, the Railroad Revitalization and Regulatory Reform Act of 1976, 90 Stat. 31 (1976) [hereinafter the 4–R Act]. There is no doubt that the ICC viewed their 1978 change of policy as a significant change in the law. The ICC recognized that before this change of policy, "contract rates between railroads and ship-

pers have been held to be illegal as in violation of the Interstate Commerce Act." See Ex Parte No. 358–F, Change of Policy, Railroad Contract Rates, at 1 (November 9, 1978).

The Staggers Rail Act of 1980 further deregulated railroad rates, and other aspects of the railroad business in an effort to enable railroads to implement rate increases in order to obtain adequate revenues and realistic cash flows. As discussed in greater detail below, a provision of the Staggers Act expressly authorizes railroad contract rates, and a "grandfather clause" gives continuing validity to "any lawful contract" previously in effect.

The changes in the law in 1978, and thereafter, are interesting but irrelevant as to the question of whether or not a contract existed between the parties in 1972. We hold that there could have been no contract between the parties in 1972, in part because such contracts were illegal per se under the law as it then existed, and the parties knew they could not be bound by their representations and "understandings."

The notion that rate contracts were illegal per se stems from the opinion of the United States Supreme Court in Armour Packing Co. v. United States, 209 U.S. 56, 28 S.Ct. 428, 52 L.Ed. 681 (1908). In that case, the court held that a shipper who obtained a rebate, concession, or otherwise reduced shipping rate, could be found guilty of an offense under the Elkins Act regardless of bad faith, fraudulent conduct or lack of criminal intent. The court's holding in that case set the standard of illegality per se. The court's holding in Armour Packing was based on the "central and controlling purpose" of the Interstate Commerce Act, which required all shippers to be treated alike, and but one rate to be charged for similar carriage of freight, and that the filed and published rate be equally known by and available to every shipper. Id. at 80, 28 S.Ct. at 435. The court rejected specifically the argument that rate contracts should be recognized, because "there is no provision for the filing of contracts with the shippers and no method of making them public defined in the statute." Id. at 81, 28 S.Ct. at 435. The court held that rate con-

tracts could not be recognized, because such recognition was not intended by Congress. Id. at 82, 28 S.Ct. at 435. The court held that shipping rates were subject only to the published tariff:

"If the shipper sees fit to make a contract covering a definite period for a rate in force at the time he must be taken to have done so subject to the possible change of the published rate in the manner fixed by statute, to which he must conform or suffer the penalty fixed by law." (Emphasis supplied.) Id. at 82, 28 S.Ct. at 436.

Even prior to the court's opinion in Armour Packing, the court had held that there was no right for a carrier to charge other than the published rate because of a contract. See New Haven Railroad Company v. Interstate Commerce Commission, 200 U.S. 361, 26 S.Ct. 272, 50 L.Ed. 515 (1906).

In 1972, the law of this circuit was also squarely against the enforceability of private contracts between carriers and shippers. Tariffs were held to bind both carrier and shipper with the force of law. Atchison, Topeka & Santa Fe Railway Co. v. Bouziden, 307 F.2d 230, 234 (10th Cir. 1962). The "intricacies of private contract" were not to be permitted to result in rate discrimination, actual or potential. Empire Petroleum Co. v. Sinclair Pipeline Co., 282 F.2d 913, 916 (10th Cir. 1960). No contract could vary or alter the obligations and duties between shipper and carrier. The tariff was the sole legal instrument to govern the relationship between shipper and carrier. Bernstein Bros. Pipe & Machinery Co. v. Denver & Rio Grande Western Railroad Co., 193 F.2d 441, 444 (10th Cir. 1951). In Bernstein, supra, the court stated:

"The amount of a transportation charge for goods shipped in interstate commerce is not a matter of private contract between the parties. The shipper and carrier are alike bound by the established and published tariff rate under the provisions of §§ 3(2) and 6(7), supra . . . ." (Emphasis supplied.) Id. at 444.

In 1972, the courts of this circuit were bound and obligated to apply the tariff as it

was published. The courts in this circuit were obligated to treat the tariff as though it were a statute binding both the carrier and the shipper to the rates, charges, rules and regulations published therein. *Bernstein Bros., supra.* No contract or agreement was enforceable to supersede or vary the tariff. *T. & M. Transportation Co. v. S. W. Shattuck Chemical Co.,* 148 F.2d 777, 779 (10th Cir. 1945); *Miller v. Ideal Cement Co.,* 214 F.Supp. 717, 720 (D.Wyo.1963). *See also, Atchison, Topeka & Santa Fe Railway Co. v. Robinson,* 233 U.S. 173, 34 S.Ct. 556, 58 L.Ed. 901 (1914).

Contracts for rates therefore were unenforceable in 1972. KPL makes the argument that the contract between the parties could also be construed as a contract to file a tariff, as opposed to a contract for a specific rate. This is a distinction without a difference. Shippers and carriers are limited by the Interstate Commerce Act to the rates set by tariffs. 49 U.S.C. § 6(7). Private contracts between shippers and carriers which obligate a carrier to file a particular tariff have been unenforceable since 1911. *See Sandusky-Portland Cement Co. v. Baltimore & Ohio Railway Co.,* 187 F. 583 (7th Cir. 1911). The court in *Sandusky* was presented with the same argument KPL is making to this court in the instant case. The Seventh Circuit Court of Appeals held unenforceable a contract by a carrier which bound them to file and maintain given freight rates for the future. *See also, Texas & Pacific Railway Co. v. Abilene Cotton Oil Co.,* 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907). The law simply did not permit private contracts which obligated a carrier either to file a particular tariff or to transport goods in interstate commerce at a particular rate.

It is a basic legal maxim that everyone is presumed to know the law. *Ramsey v. Hand,* 185 Kan. 350, 343 P.2d 225 (1959), *cert. denied* 362 U.S. 970, 80 S.Ct. 956, 4 L.Ed.2d 901 (1959). The parties, both doing substantial business subject to being regulated by state and federal statutes, including the Interstate Commerce Act, are presumed to have known the laws of the United States in regard to interstate commerce and the case law since the very early

days of the 20th Century which interpreted the Interstate Commerce Act. The parties, knowing they could not be legally bound, did not intend their negotiations and letters of understanding to be the basis of, or of themselves, legal contracts. Both parties knew that any "contract" was illegal and unenforceable under the law in the early 1970s; therefore, there was no intent to enter into a contract. The controlling question as to whether a binding contract has been entered into depends on the intention of the parties. *Sidwell Oil & Gas Co., Inc. v. Loyd,* 230 Kan. 77, 630 P.2d 1107 (1981). Intention is a question of fact. *Butler v. Westgate State Bank,* 3 Kan.App.2d 403, 596 P.2d 156, *rev'd. on other grounds* 226 Kan. 581, 602 P.2d 1276 (1979). In order for parties to form a binding contract, there must be a meeting of the minds. *Sidwell Oil & Gas Co., Inc. v. Loyd, supra; Care Display, Inc. v. Didde-Glaser, Inc.,* 225 Kan. 232, 589 P.2d 599 (1979). The court concludes as a matter of law that there was no contract in this case, because neither party intended to be bound by their representations, and because there was no meeting of the minds as to each party's obligations to perform in accordance with their understandings.

Similarly, the court finds that there was no offer and acceptance in this case. An offer is defined as a manifestation of willingness to enter into a bargain. *Restatement (2d) of Contracts,* § 24. The letter of November 30, 1972, does not on its face manifest a willingness on the part of BN to enter into a bargain with KPL, and certainly does not invite KPL's acceptance as a means of concluding a bargain. *Restatement, supra.* The letter is only what it purports to be, that is, an outline of BN's intent and understanding regarding the movement of coal from Belle Ayr, Wyoming, to a proposed plant near Delia, Kansas. It is nothing more than a statement of BN's position in on-going negotiations, that is, a statement of BN's understanding of the course of negotiations to that point in time. The court cannot find explicit reference to a desire to enter into a bargain with KPL, nor can the court infer such an intent from the letter.

We have examined the remarks by Balfour Jeffrey, President of KPL, on March 6, 1973, in Topeka, Kansas. (Plaintiff's Exhibit No. 53.) These remarks were made in the form of a speech announcing KPL's intent to build the Jeffrey Energy Center in Delia, Kansas. Even straining to the utmost, we cannot conclude that Mr. Jeffrey's speech in any way accepted BN's "offer" of November 30, 1972. Mr. Jeffrey's speech was nothing more than a public announcement of KPL's undertaking to erect and operate a major electric energy center in Kansas. Alternatively, KPL does not contend the speech itself was the acceptance of BN's "offer," but rather that the decision to build the power plant in Pottawatomie County constituted acceptance. Neither the decision on the Jeffrey Energy Center's location, nor the completion of a long-term coal contract from a mine served by BN, can be construed as acceptance of the November 30, 1972, letter.

█ We reiterate, the November 30, 1972, letter was not an "offer." However, even had it been an offer, there is no evidence before the court to indicate that the terms of this "offer" contemplated acceptance in the form of a public speech to the news media or construction of a huge power plant. Acceptance of an offer is a manifestation of assent to the terms of the offer, made by the offeree in a manner invited or required by the offerer. *Restatement (2d) of Contracts*, § 50. The "offer" of November 30, 1972, did not invite or require acceptance in the form of a public statement or construction of the power plant.

It simply strains belief to the breaking point to accept KPL's argument in this court that it believed it was entering a contract in this manner. We cannot believe that KPL could seriously take one letter out of the context of continuing negotiations and correspondence, and regard that one letter as an offer which invited acceptance in the form of a public speech and the commencement of construction on a huge power plant. Cross-examination of plaintiff's witnesses revealed that other long-term contracts were the product of KPL's staff of attorneys and KPL's board of directors. Other long-term contracts were

memorialized in a single document signed by all parties to the agreement. We conclude that KPL knew at all relevant times that it had no legal agreement with BN, but only a vague and unenforceable "understanding" with BN in regard to some details of the proposed movement of coal. The November 30, 1972, letter does not invite KPL to secure a coal supply contract from AMAX to build coal-fire units at the Jeffrey Energy Center or to ship coal. There is no reference to KPL constructing a power plant.

If KPL's conduct was an acceptance, there is great doubt as to what, exactly, KPL was accepting. The purported offer contained in the letter of November 30, 1972, is silent on several crucial points, and KPL's attempt to argue around these omissions are unconvincing.

For example, there is no reference in the November 30, 1972, letter to a duration term. KPL would have us enforce this contract for the duration of the AMAX coal supply contract, but there is no reference in the November 30 letter to the AMAX coal contract, a term of forty years, the year 2013, the anticipated life of the Jeffrey Energy Center, or any other period of time suggested by KPL as a reasonable duration. KPL asserts that the parties intended the duration of the coal movement "contract" to be measured by the overall fuel supply requirements for the Jeffrey Energy Center, however, the November 30 letter is silent in this regard too.

The November 30 "offer" fails to set forth any definite quantity of coal to be shipped. KPL argues that the quantity of coal was intended to be determined by KPL's requirements. KPL's assertion of a requirements contract is unconvincing because KPL never promised to ship all of its requirements of coal for the Jeffrey Energy Center by BN, and Mr. Jeffrey admitted there was no provision in the "contract" committing KPL to ship its requirements via BN. Additionally, under the coal supply contract with AMAX, AMAX can supply coal to KPL from alternate sources as long as the coal meets the same specifica-

tions, which sources may not be served by BN.

 Finally, the Kansas Statute of Frauds, K.S.A. 33–106, requires contracts not to be performed within the space of one year to be in writing. To satisfy the statute of frauds, the writing must be complete in itself, leaving nothing to rest in parol. *Walton v. Piqua State Bank*, 204 Kan. 741, 466 P.2d 316 (1970). The fact that KPL seeks to satisfy the statute of frauds by introducing into evidence almost two hundred documents covering a six-year span further indicates to the court that KPL never seriously considered itself bound by contract to BN. To satisfy the Kansas Statute of Frauds, the memoranda must embody all the essential and material parts of the agreement between the parties "with such clarity and certainty as to show that the minds of the parties had met on all material terms and with no material matter left for future agreement or negotiation." *Progress Enterprises, Inc. v. The Litwin Corp.*, 225 Kan. 212, 589 P.2d 583 (1979). The court finds that the memoranda relied on by plaintiff are not sufficient to meet this standard. When taken as a whole, the memoranda relied on by plaintiff showed no more than a continuing series of negotiations and understandings between the parties, and contained no certainty as to the material terms and conditions of the "contract" between the parties. K.S.A. 33–106 does not allow these material uncertainties to be supplied by oral testimony.

Thus, the court holds that there was no contract between the parties because there was no meeting of the minds, and, consequently, no intention to be bound in a legal relationship; and, secondarily, because the purported contract omits or is vague on several important points and otherwise not in compliance with the statute of frauds. Notwithstanding these deficiencies, KPL contends that this is the very sort of agreement which was made legal and enforceable by § 208 of the Staggers Act. The court cannot agree, and holds that § 208, on its face, and by the congressional intent with which it was enacted, does not apply to the issues in this case. Section 208 of the Staggers Act states:

"The provisions of this section shall not affect the status of any lawful contract between a rail carrier and one or more purchasers of rail service that is in effect on the effective date of the Staggers Rail Act of 1980. Any such contract shall hereafter have the same force and effect as if it had been entered into in accordance with the provisions of this section. Nothing in this section shall effect the rights of the parties to challenge the existence of such a contract." 49 U.S.C. § 10713(j).

 Section 208 of the Staggers Act applies on its face only to lawful contracts between a rail carrier and one or more purchasers of rail service. As discussed above, the court holds that in this case there was no contract of any kind between KPL and BN on the effective date of the Staggers Rail Act of 1980. Therefore, § 208, on its face, does not apply to this case.

After considering the legislative history of § 208, the court finds that even had there been a contract between KPL and BN in the years before 1978, § 208 of the Staggers Act was not intended by Congress to apply to such a contract or to parties in the position of KPL and BN. The court refers specifically to the remarks of Mr. Dingell, the sponsor of § 208 in the House of Representatives. *See Congressional Record* H10085 (Daily Edition, Sept. 30, 1980). Mr. Dingell said:

"My concern in this matter stems from the fact that the Detroit Edison Company, which serves millions of energy consumers in southeastern Michigan, has a contract with the Burlington Northern Railroad covering over a hundred and fifty million tons of coal still to be delivered over a time period extending to the year 2001. Earlier this year, *the ICC held Burlington Northern to the rate basis it quoted to induce Detroit Edison to commit itself to western coal from a BN-served mine.* But the commission lacks the contract-enforcing powers of a court of law, and its decision therefore rested on its power to prescribe lawful maxi-

mum reasonable rates. Since that power is now to be limited (by the Staggers Act), the result would have opened the door for the BN to drive home a rate increase which would have cost the rate payers of southeastern Michigan a half a billion dollars over the next two decades." (Emphasis supplied.)

We think the portion of the Congressional Record just quoted reveals the definition of the term "lawful contract" in § 208 of the Staggers Act. The Detroit Edison situation referred to by Mr. Dingell concerned a contract declared lawful by the ICC itself. Mr. Dingell's concern, and his reason for introducing into Congress § 208, was to assure enforcement of contracts held lawful by the ICC. Mr. Dingell, who represents the affected part of southeastern Michigan, was concerned that, since other provisions of the Staggers Act would limit the ICC's power to adjudicate maximum reasonable rates, the federal courts be explicitly empowered to enforce such lawful contracts. In this case, however, there is no argument that the ICC has ever held lawful the "contract" between KPL and BN. Therefore, there is nothing for this court to enforce under § 208 of the Staggers Act.

KPL alleges, in the alternative, that the court should apply the doctrine of *promissory estoppel* to estop BN from raising the statute of frauds as a defense and as an independent theory of liability.

 In order for the doctrine of *promissory estoppel* to be invoked, the evidence must show that: (1) a promise was made; (2) under circumstances where the promisor intended and reasonably expected that the promise would be relied upon by the promisee; and (3) that the promisee acted reasonably in relying on the promise. *Promissory estoppel* should be applied only if a refusal to enforce it would be virtually to sanction the perpetration of a fraud or would result in injustice. *Berryman v. Kmoch*, 221 Kan. 304, 307, 559 P.2d 790 (1977). In other words, a promise is binding and will be enforced when it is a promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, and which does induce such action or forbearance, and if injustice can be avoided only by enforcement of the promise. *Kirkpatrick v. Seneca National Bank*, 213 Kan. 61, 515 P.2d 781 (1973). See also, *Marker v. Preferred Fire Ins. Co.*, 211 Kan. 427, 506 P.2d 1163 (1973).

 The court finds that KPL has failed to prove the elements of *promissory estoppel* necessary to allow the court to grant relief under this equitable theory.

KPL has not shown that BN made a promise upon which BN reasonably expected KPL to act in reliance. KPL contends that the letter of November 30, 1972, was just such a promise. This letter, however, contains no promissory language. The letter opens with the following language, which explains exactly what this letter was: "This letter will serve as an outline of the intent and understanding that Burlington Northern Inc. and Union Pacific Railroad Company have regarding movement of coal from the AMAX Coal Company Belle Ayr Mine at Belle Ayr, Wyoming, to Kansas Power and Light Company's proposed plant site near Delia, Kansas." This letter was not a promise by BN; it was nothing more than a letter outlining BN's intent and understanding concerning the current state of negotiations between the parties regarding the movement of coal from Wyoming to Kansas. BN does not undertake to obligate itself to do anything in this letter. BN does not promise to do anything in this letter. Without a promise, plaintiff cannot prevail on its theory of *promissory estoppel.*

As a second and equally compelling ground for denying plaintiff's recovery on the theory of *promissory estoppel* is plaintiff's failure to show reasonable reliance on the so-called promise by BN.

As noted above, the parties are presumed to know the law. Plaintiff alleges that its reliance took place in late 1972 and early 1973, with the decision to commit itself to the AMAX Coal Company and to commit itself to building its power plants near Delia, Kansas. Any reliance on BN's representations at that time, however, could not be reasonable reliance as a matter of law.

From the early days of this century, tariffs have been treated as though they were statutes binding both carriers and shippers as to rates, charges, rules and regulations. As a matter of law, estoppel was not a theory which could be enforced against a carrier who was subject to the provisions of the Interstate Commerce Act. *Louisville & Nashville Railroad Co. v. Central Iron & Coal Co.*, 265 U.S. 59, 65, 44 S.Ct. 441, 442, 68 L.Ed. 900 (1924); *Southern Pacific Co. v. Interstate Commerce Commission*, 219 U.S. 433, 443, 31 S.Ct. 288, 290, 55 L.Ed. 283 (1911); *Atchison, Topeka & Santa Fe Railway Co. v. Bouziden*, 307 F.2d 230, 235 (10th Cir. 1962); *Empire Petroleum Co. v. Sinclair Pipeline Co.*, 282 F.2d 913, 916 (10th Cir. 1960); *Bernstein Bros. Pipe & Machinery Co. v. Denver & Rio Grande Western Railroad Co.*, 193 F.2d 441, 444 (10th Cir. 1951); *St. Louis-San Francisco Railway Co. v. Miller Floors, Inc.*, 293 F.Supp. 869, 870 (W.D.Okl.1968); *Miller v. Ideal Cement Co.*, 214 F.Supp. 717, 720 (D.Wyo.1963); *Atchison, Topeka & Santa Fe Railway Co. v. Kinkade*, 203 F. 165, 166 (D.Kan.1912) (J. Pollock). *See also, Sandusky-Portland Cement Co. v. Baltimore & Ohio Railroad*, 187 F. 583 (7th Cir. 1911).

We presume that KPL knew the law. Therefore, we presume that KPL knew that BN could not be estopped by its representations. If KPL knew that BN could not be estopped, then KPL knew, of necessity, that it had no right to rely on BN's representations, whether or not they were promises. Similarly, if we presume that KPL knew that its relationship with BN in regard to the movement of coal by rail was governed exclusively and solely by the tariff filed with the ICC, then as a matter of law KPL could rely only on the tariff and could not reasonably rely on BN's representations.

In conclusion, the court finds that there was no contract between the parties. The court further finds that plaintiff is not entitled to judgment under the theory of *promissory estoppel*.

In regard to the parties' designation of portions of various depositions filed with the court as evidence in this case, the court hereby overrules any objections to designations and testimony which have not been specifically sustained herein.

IT IS BY THE COURT THEREFORE ORDERED that judgment be entered for defendant, and that plaintiff take nothing by its complaint. IT IS FURTHER ORDERED that the temporary restraining order and preliminary injunction entered heretofore in this case are hereby dissolved.